HENRY B. SCHNEPFE, Executor.

*vs.*

CAROLINE M. SCHNEPFE.

*Administrators : payment of claims; sections 83, 97, 99 and 100, etc., of Article 93 of Code; claims already established by judicial decisions; deficient estate; protection of administrator. Husband and wife : ante-nuptial contracts; dower; jurisdiction of equity; desertion by wife.*

Sections 83, 97, 99 and 100, etc., of Article 93 of the Code, providing that administrators shall not discharge, or be allowed for, any claims against their decedents, unless first passed by the Orphans' Courts, do not exclude from distribution claims established by courts of justice.     p. 335

At common law, ante-nuptial agreements were not sufficient to bar dower.     p. 337

Courts of equity have jurisdiction to enforce ante-nuptial contracts.     p. 337

The mere fact that a wife has separated from her husband, is not sufficient to defeat her enforcement of an ante-nuptial contract.     pp. 343-344

Md.]                           Syllabus.

Where a testator's estate is not sufficient to pay in full an equitable claim against it, the decree therefor should be so framed as to protect the executor.                    p. 345

*Decided December 2nd, 1914.*

Appeal from Circuit Court No. 2 of Baltimore City. (GORTER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, PATTISON, URNER and CONSTABLE, JJ.

*August W. Schnepfe* and *George G. Schnepfe,* for the appellant.

*William Colton and F. N. Tannar,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

On the 9th day of June, 1904, Caroline Mahle, who was then a widow, entered into a marriage settlement with John Henry Schnepfe, which began with the recital that

"Whereas, a marriage is intended to be solemnized between the said Caroline Mahle and John Henry Schnepfe, and in view of which they desire to provide that certain real and personal property shall, after the said intended marriage has taken place, be possessed, enjoyed and disposed of as though they were unmarried * * * ."

In paragraph 1 it was agreed that "In consideration of the said intended marriage and certain other good and valuable considerations" said Caroline Mahle shall continue to possess

the real and personal property which she then owned, with power to dispose of it, absolutely or conditionally, by deed or will, notwithstanding her coverture, and a similar provision was made as to property acquired by her during coverture, and Mr. Schnepfe agreed to unite with her in the execution of such deeds and conveyances as might be required.

Paragraph 2 provided that:

"In consideration of the said Caroline Mahle uniting in marriage with the said John Henry Schnepfe, the said John Henry Schnepfe doth agree to pay in lieu of any dower interest which she, the said Caroline Mahle, would acquire in his, the said John Henry Schnepfe's estate, the sum of $12,000.00; the said $12,000.00 to be paid to the said Caroline Mahle upon the death of the said John Henry Schnepfe out of whatever estate the said John Henry Schnepfe may die seized of, said payment to be made prior to the distribution of said estate;"

and provision was made that in the event of the death of Caroline Mahle during said Schnepfe's lifetime he was to pay the $12,000.00 to her children by Jacob Mahle, and he further agreed to relinquish all right, title and interest which he would acquire by way of curtesy in the estate of Caroline Mahle.

Paragraph 3 is as follows:

"3. That in consideration of said marriage, and the further consideration of the payment of $12,000.00 aforesaid by the said John Henry Schnepfe to the said Caroline Mahle, the said Caroline Mahle doth relinquish all right, title and interest, which she, the said Caroline Mahle, shall acquire by way of dower in the estate of the said John Henry Schnepfe, and she, the said Caroline Mahle, doth further agree to unite with the said John Henry Schnepfe in the execution of all such needful deeds or conveyances or instruments in law as may be required by the said John Henry

Schnepfe to transfer or convey any or all of the prop-
erty of which the said John Henry Schnepfe may be
now possessed or shall hereafter acquire."

The appellee filed the bill in this case against the executor
of the said John Henry Schnepfe in which she alleges: (1)
that on or about the 13th of November, 1913, said Schnepfe
died seized and possessed of a very considerable estate, made
up of real and personal property and securities, and cash of
great value and amount; (2) that she and said Schnepfe
were married on the 11th of July, 1904, in Baltimore,
wherein she and he resided until the time of his death,
although for a great many years since their marriage they
lived separate and apart; (3) that shortly before their mar-
riage they made the ante-nuptial contract referred to above,
a copy of which is filed; (4) she refers specially to the pro-
vision of the agreement that he was to pay the $12,000.00;
(5) alleges that at the time of making the agreement and
at the time of the marriage he had subject to call upwards of
$42,000.00 deposited in bank and stocks, &c., which are set
out in the bill; (6) that he left what purported to be a will,
a copy of which is filed; (7) that said will was admitted to
probate and Henry B. Schnepfe qualified as executor; (8)
that many questions must arise in the administration of the
estate which required the construction of the will; (9) states
various questions which she alleges must arise; (10) that her
rights can only be protected by the administration of the
estate under the direction and control of the lower Court;
(11) that she has not been able to discover and ascertain what
property and estate said Schnepfe left. "Nor has she been
able to ascertain and discover where and how invested, if at
all, the sum of twelve thousand dollars, hereinbefore recited
and mentioned in the ante-nuptial (contract) or agreement
herein exhibited, is or may be, if indeed such fund or the
proceeds thereof actually exists, and may be directly iden-
tified or ear-marked;" (12) that her husband was at the
time of his death in his 75th year, and she was in her 76th

year; (13) that so far nothing has been accomplished in the Orphans' Court by the executor, except he has qualified as such, so far as the records show.

The prayers of the bill are: (1) That the estate be administered under the direction and control of the lower Court; (2) that the will be construed; (3) that the executor answer the bill under oath, and disclose and set forth in detail all the property and estate of the said John Henry Schnepfe, real, personal and mixed, money in bank, the securities, stocks, bonds and choses in action in his name, and subject to his order; that the real and leasehold property of which he died seized and possessed be described, and if the sum of $12,000.00 was set apart by the deceased in his deposit box at the Drovers & Mechanics National Bank, or elsewhere, or stocks, bonds or securities representing such amount are in, his possession, identified or ear-marked as the property of the plaintiff; or if they have not come into his possession but defendant has knowledge and information thereof, that he may disclose the same fully and at large in his answer; (4) "That the said ante-nuptial contract or agreement hereinbefore set out between your oratrix and the said John Henry Schnepfe deceased, her husband, may be established and enforced herein, and that the said defendant, Henry B. Schnepfe, executor as aforesaid, may be decreed to pay over unto your oratrix said sum of twelve thousand dollars, or turn over to her such securities, stocks or bonds of the full value thereof, if such be in the custody and possession of the said defendant, together with such income accrued and accruing thereon and thereupon, if any, in the hands of said defendant, and due unto your oratrix, and to account with her therefor," and (5) for general relief.

An answer was filed at length and among other allegations in it is one that the plaintiff had abandoned the said John Henry Schnepfe for more than three years, which abandonment bars her from enforcing the ante-nuptial agreement, and another is that the bill does not state such a case as en-

titles her to relief in equity—the jurisdiction of a Court of
Equity being denied.  A copy of an inventory containing
stocks and personal property and cash amounting to $15,-
963.45 was filed with the answer.

The lower Court passed a decree requiring the defendant
to pay the plaintiff the sum of $12,000 and the costs of the
proceeding, but denied all other relief prayed for.  From
that decree this appeal was taken.

Although the attorneys for the appellant have displayed
commendable zeal and industry in the preparation of their
brief, it will not be necessary to separately pass on all the
points raised by them or refer to all of the authorities cited.
It may be well to say in the beginning that we cannot assent
to the position taken by the counsel for the appellant that the
fact that the claim of the plaintiff was not passed by the
Orphans' Court or proven as provided for in Article 93 pre-
cludes her from maintaining this bill.  It is true that Section
83 of Article 93 says that no administrator shall discharge
any claim against his decedent (otherwise than at his own
risk), unless it be first passed by the Orphans' Court, or be
proven according to the rules prescribed in that article, and
Section 97 provides that "No administrator shall be allowed
in his account for any claim discharged by him unless he
produce the claim passed by the Orphans' Court or proven
as herein directed," but those sections are not intended to
exclude from distribution a claim established by a Court of
justice.   Section 99 provides that no administrator shall be
obliged to discharge a claim of which vouchers and proof
shall be exhibited as aforesaid, but may reject and at law
dispute the same, in case he has reason to believe that the
deceased never owed the debt or had discharged the same or
a part thereof, or had a claim in bar, and Section 100 pro-
vides that in no case shall the order of the Orphans' Court or
Register of Wills that an account or claim will pass when
paid be deemed of validity to establish such claim or ac-
count.  If a creditor knows that his claim will be contested,

or if he cannot procure the proof that is necessary in order to comply with the provisions of Article 93, there can be no reason why he should not sue, in law or equity, as the nature of the claim may require or authorize.   Indeed Section 116 says:

> "No administrator shall be bound to take notice of any claim against his decedent unless the same shall be exhibited to such administrator legally authenticated; or unless such claim shall have been passed by the Orphans' Court and entered by the Register upon his docket, *or unless a suit shall be pending against such administrator for such claim.*"

Other sections might be referred to but we do not deem it necessary.   What was said in *Steuart* v. *Carr,* 6 Gill, 430, on page 444, in reference to the statute then under consideration may be applied to this case.   It was there said: "The only answer that need be given to this new ground of defense is that this section of the Act of Assembly never was designed to apply, and by the judicial tribunals of the State never has been held as applying to cases where the notice to the executor or administrator has been given through the medium of a *lis pendens* or been in due time followed by it.   Numerous cases must arise and have arisen where the authentication of claims in the particular mode prescribed by the Acts of Assembly was impracticable, and for the recovery of which, resort to a Court of justice was the only alternative left to the creditor for the recovery of his claim."   The position taken in this case by the executor shows that it would have been useless for the appellee to have proven his claim in the Orphans' Court, even if it be conceded that it could have been validly determined by that Court.

It will not be necessary to consider all of the prayers of the bill, for if the decree was justified under any of them, that is sufficient, regardless of whether other relief could be granted.   Without now referring to other prayers in the bill, the third and fourth, laying aside any question about the

one for general relief, were sufficient to give the Court juris-
diction to pass the decree appealed from.   An ante-nuptial
agreement was not sufficient to bar dower at common law,
and hence they have been frequently before Courts of equity.
In the note to *Kroell* vs. *Kroell*, 219 Ill. 105, as reported in
4 Am. & Eng. Ann. Cas. 801, it is said: "Ante-nuptial con-
tracts, by which it is attempted to regulate and control the
interest which each of the parties to the marriage shall take
in the property of the other, during coverture or after death,
such as dower and the like, are favored by the Courts and will
be enforced in equity according to the intention of the par-
ties, whenever the contingency provided for by the contract
arises."   In the note to *Rieger* v. *Schaible,* 81 Neb. 33, as
reported in 16 A. & E. Ann. Cas. 700, the more recent cases
are cited.   It will be seen by an examination of them that a
Probate Court or Orphans' Court, or by whatever name the
Court having jurisdiction of probate matters may be known,
has determined many of the questions which arose under
ante-nuptial contracts, but they are either when such Courts
have been given sufficient powers by statute, or the question
was such as those Courts could properly determine, and many
of them expressly recognize the jurisdiction of Courts of
equity.   The case of *Naill* v. *Maurer,* 25 Md. 532, which is
one of the leading cases on the subject, is cited in the note
in 4 A. & E. Ann. Cas., and in the principal case in 16 A.
& E. Ann. Cas.   The bill was filed in that case by the appellee
for an allowance of dower in the real estate of her husband.
The defense was that her right to dower was barred by an
ante-nuptial contract, and the Court so finding reversed the
decree and dismissed the bill.   In speaking of the contract,
the Court said: "The main object in view was the consumma-
tion of the marriage, and it was to that end that the contract
was executed.   It seemed almost impossible to view the con-
tract as founded on any other consideration, although the
reciprocal character of the stipulations might be held to con-
stitute one sufficient to make the contract binding and effec-
tive."   The Court then held that section 289 (now 306) of

Art. 93, in reference to an estate settled on a married woman by the husband by jointure, or other settlement before marriage, did not deprive the wife of her power to bar her dower by any other form of ante-nuptial contract. The Court said: "Her power to bind herself by such a contract, in equity, must be admitted, and we do not doubt that this contract constitutes an equitable bar to the claim sought to be enforced by this bill," and cited cases which distinguish an equitable from a legal bar of dower—showing an ample reason why such cases should be entertained by Courts of equity.

The case of *Schnepfe v. Schnepfe,* 108 Md. 139, was an appeal by the husband from a decree rendered against him in favor of the appellee, by which he was required to pay into Court sufficient cash to buy stock of the City of Baltimore to the amount of $20,000.00, in order to secure the $12,000.00 named in this contract. Under the decree the clerk was to act as trustee and was to pay over the income therefrom to the defendant during his life and at his death to turn the stock over to his executors, who were directed to sell it, and out of the proceeds to pay $12,000.00 to his widow, or if she was dead, to her children. That decree was reversed, and after giving other reasons for the reversal the Court said: "The appellee's counsel contend, however, that the decree is in effect the specific enforcement of the ante-nuptial contract, and therefore clearly within the powers of a Court of equity. But we think if allowed to stand the decree would in effect make a different contract from that entered into by the parties." It was not intimated or suggested by the Court that there was any doubt about the jurisdiction of a Court of equity to pass a decree enforcing this ante-nuptial contract, but the decree which was passed by the lower Court in the judgment of this Court in effect made a new contract for the parties, and it might have been added that the time for the enforcement of it had not arrived. In that case the Court said: "We do not discover in the whole conduct of the defendant any purpose to defeat the rights of his wife under the ante-nuptial agreement entered into between them. On

the contrary, when he was considering the propriety of putting the bulk of his property and estate in possession of two of his sons, as above mentioned, he was advised to keep enough in his own right to meet his obligation to his wife under the ante-nuptial agreement, and he expressly reserved the bank stock, worth then more than $12,000.00, and yearly increasing in value, for that very purpose. There was no intimation anywhere in the evidence that the defendant had evinced any intention of disposing of this stock, and so far as appears, it will remain intact for the purpose for which it was set aside."

It will be remembered that that was a case in which the appellee prayed for a divorce *a mensa et thoro,* for alimony, and counsel fees, and for an injunction to prevent the defendant from disposing of his property for the purpose of defeating the marriage contract, and in showing that the evidence did not warrant the belief that the defendant intended to dispose of his property for that purpose, the Court said it was true he had divided among his children a large part of his fortune, "but he expressly reserves fifty-two shares of stock in the Drovers and Mechanics National Bank of Baltimore, which according to the testimony is worth $240.00 per share, or more than $12,000.00 in all, for the purpose of meeting his obligation to his wife under the ante-nuptial agreement." The Court then spoke of the fact that he had placed in the hands of two of his sons stocks, bonds and money to the value of about $81,000.00, which they held under a verbal trust to dispose of according to their father's wishes. In view of such facts being found by the Court, based on the record before it, as to the property of Mr. Schnepfe, in a case where the same ante-nuptial contract was being considered, can it be doubted that the proper and most natural remedy was to ask for discovery and disclosure as to the $12,000.00 and for a decree to enforce it? It will be seen from this record that the inventory filed by the executor shows that he had in hand 52 shares of the Drovers and Mechanics National Bank, the exact number of shares which

Mr. Schnepfe proved in the other case he had reserved for the purpose of meeting his obligation to his wife.

But if any additional authority be necessary to show that a Court of equity has jurisdiction to enforce an ante-nuptial contract, *Offutt* v. *Offutt*, 106 Md. 236, is sufficient. In that case this Court not only enforced such a contract, based on a letter of the husband, but it remanded the cause that the proceedings might be referred to the auditor to ascertain from testimony to be produced before him the proper sum to be allowed the plaintiff for her support, the promise being to take care of and support his intended wife as long as she lived. A number of cases there cited show that ante-nuptial contracts are enforceable in equity.

We are therefore of the opinion that there was ample ground for the lower Court granting the relief it did, unless the appellee had barred herself of the right to such relief.

That brings us to the question, whether the separation of Mr. and Mrs. Schnepfe prevents her from having this contract enforced. The appellant has cited statutes in a number of States declaring the effect of desertion on the property rights of a husband or wife, but as we have no such statute they cannot reflect upon this case, unless it be that it may be inferred that it was thought necessary in those States to pass statutes, in order that desertion should have such effect as is here claimed. A number of authorities were also cited to show a denial of property rights because the party seeking relief had been guilty of desertion. The only one which seems to us to be really in point is *York* v. *Ferner*, 59 Iowa, 487. Without meaning to commit ourselves to the rule announced by that learned Court, it is sufficient to say that the facts of that case, as stated in the opinion, differ widely from those in this record. It is there said that the wife without cause utterly refused to live with her husband longer than seven weeks and three days after the marriage, and that she abandoned him without lawful cause. The excuse set up by the wife for leaving her husband was his drunkenness, but

the Court said his habits were not different from what they were when she entered into the contract and married him.

While it is true that this bill admits that Mr. and Mrs. Schnepfe were separated and the answer "avers the deliberate and uninterrupted abandonment for more than three years by the plaintiff, Caroline M. Schnepfe, of her husband, John Henry Schnepfe, bars the plaintiff from enforcing the ante-nuptial agreement," the plaintiff filed a replication to the answer and there is not sufficient in the record to show that she did not have sufficient cause to separate from her husband. In the case referred to above and reported in 108 Md., the appellee did seek to obtain a divorce *a mensa et thoro,* which was denied by the lower Court and was not passed on by this Court, but the opinion was filed by us over six years ago, and it does not necessarily follow that because a divorce was refused the appellee was so much to blame for the separation that the ante-nuptial agreement cannot be enforced. On the contrary, the same learned Judge who refused to grant the divorce passed the decree which was reviewed in that case, and also the one which is now being considered. Even if that divorce had been granted, it would not have deprived the wife of her dower or her share in the personal property. *Hokamp* v. *Hagaman,* 36 Md. 517. But regardless of that, the general rule, as stated in Section 367 of *Schouler on Husband and Wife,* is that "There is this difference pointed out between promises and agreements in consideration of marriage, and all other agreements; namely, that the contract, though broken by one of the parties, remains binding upon the other. The reason for this is, that such promises and agreements affect not only the rights of the married pair, but those of their offspring; the children being, in fact, regarded as purchasers, but where the performance is sought by the defaulting party, the contract cannot be enforced against the person injured through such default; though performance by one party is not necessarily a

condition precedent to a right to sue the other." See also 19 *Am. & Eng. Ency. of Law,* 1244.

But we are not without authority in this State relative to the subject. In *Morey* v. *Michael,* 18 Md. 227, the bill was filed by the executrix of Catharine Michael and her husband against the husband of said Catharine to recover a sum of money which it was alleged the husband had received from Catharine under an ante-nuptial contract, subject to a power of appointment by her will, and to which the plaintiffs were entitled under the will of said Catharine. It was held that the power in the contract was not executed by the will, and hence all that the plaintiffs were entitled to recover was the interest which matured in the lifetime of Mrs. Michael. The case was remanded without affirming or reversing the decree, and the contract came before the Court again in *Michael* v. *Morey,* 26 Md. 239,—the daughter of Catharine Michael and her husband being the appellees. A defense then interposed was that the appellee, Caroline Morey, who was a daughter of Mrs. Michael by a former marriage, was not a *cestui que trust* under the ante-nuptial contract, which should be construed to embrace only children by the marriage with Michael. The Court held that Mrs. Morey was within the letter and spirit of the·contract, but the answer also insisted "that Catharine Michael violated all the stipulations of the marriage contract without any cause whatever, which he is advised renders all the covenants and stipulations to be performed after the death of the said Catharine utterly null and void, and that he is not, in equity, bound to comply with or perform any of the covenants in said contract not to be performed in the lifetime of the said Catharine." The Court said that was not sustained by reason or authority, and added "Although the defaulting party may not, in some instances be allowed to enforce the articles specifically, the children, the innocent objects of parental solicitude and care, are entitled to all the benefit of the uses under the settlement, notwithstanding there had been a failure on one side. *Mac*

*Queen on Husband and Wife,* sec. 3, title 'Ante-nuptial Agreements' and cases there cited." Again it was said: "There can be no equity in inflicting upon the only child of a former marriage * * * the penalty of forfeiture because of the subsequent misconduct of her mother." The Court then referred to *Sydney* v. *Sydney,* 3 P. Wms. 274, where the bill was filed by the wife for specific performance of marriage articles and the defense was that she had withdrawn herself from her husband, lived separate from him, and very much misbehaved herself, and, although there was a violent presumption of adultery, LORD CHANCELLOR TALBOT held that "the articles being that the husband should settle such and such lands in certainty on his wife for her jointure, this is pretty much in the nature of an actual and vested jointure; in regard to what is covenanted for a good consideration to be done is considered in equity as done, consequently this is a jointure and not forfeitable, either by adultery or elopement, and it was decided that the husband should perform his marriage articles." Again it was said: "The cases referred to by the appellant to sustain his defense are generally cases where the application was on the part of the defaulting party for a settlement out of her separate estate, in the absence of Articles of agreement, in which of course the parties would be remitted to purely equitable rights."

The Court concluded by saying: "There is no pretence here, however, of any misconduct on the part of the wife, greater than the use of intemperate language, and separation from husband because of unhappy domestic circumstances. There is no ground for any imputation upon her purity as a wife. She maintained respectable associates, notwithstanding her separation."

So without now adopting the principle quoted from the Lord Chancellor in 3 P. Wms., in so far as it applies to adultery, the clear inference to be drawn from the conclusion of the opinion of this Court is that mere separation from her husband by a wife is not sufficient to defeat her enforce-

ment of such a contract. That case would certainly have been conclusive if the appellee had died before her husband and her children by her former marriage were seeking to enforce the contract, and it would seem to be a peculiar rule of equity which would allow the enforcement of a contract against a husband's estate in favor of the children of his wife by another husband, whom he was under no legal obligations to support or provide for, but would not enforce the contract for his wife in her old age, who but for said contract would still be in a position to demand her rights as his widow.

In *Busey* v. *McCurley,* 61 Md. 436, "unfortunate dissensions and alienation of feeling occurred, which resulted in a separation of the parties "about two years prior to the death of the husband, but compensation was decreed instead of specific execution of the covenant which would have been attended "with no little difficulty."

These parties were not divorced and there is no evidence that Mr. Schnepfe ever attempted to procure a divorce from his wife for abandonment, or other cause. He had a large and valuable estate, and without deeming it necessary to determine whether the expression used in the ante-nuptial contract—"all right, title and interest, which she, the said Caroline Mahle, shall acquire by way of dower in the estate of the said John Henry Schnepfe"—when taken in connection with the preamble and other parts of the contract, would necessarily limit its effect to "dower" in its strict sense, if the contract be stricken down, then the appellee would not only be entitled to dower in the real estate, if any left by him, but to her share of his personal property. That might involve a controversy for a widow's share in the large amount of money and other personal property referred to in the prior case as placed in the hands of two of the sons of the deceased, which, in the language of that opinion, "they hold under a verbal trust to dispose of according to their father's wishes." as well as any other personal property he may have disposed of in a way that might be deemed suggestive of an attempt to

so place it as to be beyond the reach of his widow. It is not a meritorious defense for the executor to now set up, when the testator can no longer speak for himself—to seek to avoid the obligation solemnly made by the testator, and so far as appears from the record, intended by him to be provided for out of part of his estate set apart for that purpose, by alleging a ground, the real facts as to which no one knew better than the testator himself, and yet he did not in his lifetime seek to obtain a divorce. Inasmuch as the appellee would in the absence of the agreement have been entitled to dower and her share of the personal estate left by the husband, even if it be true that she abandoned him, as there was no divorce, we are of the opinion that the abandonment (if conceded) does not nullify the ante-nuptial contract, or make it inequitable in this case to enforce it.

No question has been raised about the sufficiency of the estate to pay the decree. If the estate left by the testator was not sufficient, of course the testator should not be required to pay it in full, and ordinarily a decree should be so framed as to protect an executor in case of an insufficiency of assets. But inasmuch as there has been no suggestion that the estate is not sufficient, and so far as appears from the record it is ample, we will not for that reason disturb the decree, but will affirm it.

> *Decree affirmed, the appellant to pay the costs above and below.*