WHITTINGTON *v.* WHITTINGTON, INDIVIDUALLY AND AS CO-EXECUTOR, ET AL.

[No. 126, October Term, 1953.]

2

4

*Decided June 23, 1954.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Hervey G. Machen,* for appellant.

*W. Meverell Loker, Jr.,* with whom were *David A. Harkness* and *Loker and Guyther,* on the brief, for appellees.

BRUNE, C. J., delivered the opinion of the Court.

Appellant filed a bill of complaint in the Circuit Court for Prince George's County requesting the court to declare either that a constructive trust existed as to the balance in four joint savings bank accounts or that the balances in the accounts were assets of the estate of appellant's late husband. The theories relied upon by appellant were: (1) that her husband by transferring funds from his savings bank accounts to four

accounts jointly in his name and the name of one or the other of two sons by a previous marriage failed to create during his lifetime valid trusts; (2) that even if two of these accounts created valid trusts, the other two did not because the signature cards did not provide for trusts (though the passbooks did), and (3) that, even if valid trusts were created, their creation amounted to a fraud upon the marital rights of the appellant. From the Chancellor's decree dismissing the bill of complaint, this appeal is taken.

The appellant and her late husband, Luther W. Whittington, Sr. were married on November 20, 1935. Both had been previously married, and at the time of their marriage, the children of their previous marriages were grown and living in separate homes. Mr. and Mrs. Whittington lived together happily on one of his farms at Dunkirk, Calvert County, until his death on July 16, 1951.

In May, 1950, Mr. Whittington determined, because of his advanced age, to sell a farm located in the lower part of Anne Arundel County, but apparently had some difficulty convincing his wife that this was advisable. Appellant refused to sign the deed to the property and thus release her dower interest. The reasons she gave were that they should keep something for their old age and in reserve, and the fact that her husband had given large sums of money at various times to his sons. After conferring with her son, however, she agreed to, and did, accept $2,000.00 out of the proceeds from the sale of the farm. She deposited the money in a bank in an account in the joint names of her husband and herself.

The Chancellor has summarized the events leading to the creation of the savings bank accounts here in dispute:

"On June 13th, 1950, the balance in his savings account in the County Bank was $598.50. Mr. Whittington, Sr., on that date went to the County Bank with the balance of the proceeds obtained from the sale of his

**6**

farm. He informed the Bank that he desired, so that a record could be made of the transaction, to place this money in his savings account, and then withdraw the entire deposit and divide the amount equally between two accounts for the benefit of each of the two sons. His individual savings account was closed by transferring $3,443.57, to each of two accounts one of which read, 'L. E. Whittington, Sr., in trust for himself, and L. E. Whittington, Jr., joint owners, subject to the order of either, and the balance at the death of either, to belong to the survivor.' The second account at the County Bank was identical in the amount and wording, except the name of Ralph E. Whittington was substituted for L. E. Whittington, Jr. These accounts remained in the Bank without any withdrawals or additions, with the exception of interest being credited thereto, until they were withdrawn by L. E. Whittington, Jr. and Ralph Whittington, respectively, on July 25th, 1951, after the death of their father, L. E. Whittington, Sr. The Assistant Cashier of the Bank testified that Mr. Whittington explained that he had made provisions for his daughter and wife, and that he wanted his two sons, L. E. Whittington, Jr. and Ralph Whittington, to have the money on deposit by dividing it equally between them. Mr. Hutchins, the Assistant Cashier, further states that he explained to the decedent how this could be accomplished, read to him the words to be used on the account and explained the steps indicating the way the accounts were to be opened, and explained further the rights of the decedent as well as his sons in the accounts. After this was read to Mr. Whittington, the Assistant Cashier states that he was informed that was the way the decedent wanted the accounts opened. The decedent then received the two bank books, each of them in the form above quoted.

"On September 8th, 1950, the decedent went to the National Bank, conferred with Mr. Mattingly, the Bank's Cashier, and stated that he wished to withdraw $10,000.00 from his individual savings account, leaving

a balance therein of approximately $9,000.00, and informed the Cashier that he desired to create two new accounts, $5,000.00 each, so that he could give to each of his two sons that amount for their use after his death. The bank books given to Mr. Whittington are identical except for the use of his sons' names and read, 'In account with Luther E. Whittington, in trust until withdrawal hereof for self and Luther E. Whittington, Jr., joint owners, subject to withdrawal by either the balance at the death of either to belong to the survivor.' Mr. Mattingly states that he explained to Mr. Whittington what the joint account was, and informed him it would be necessary that the Bank have the signature card identifying the signature of his two sons. This was obtained by the decedent, and he informed Mr. Mattingly that he wanted his boys to each have $5,000.00, and was opening these two accounts for that purpose, but he didn't want them to use the money until after his death.

"The undisputed testimony in the case shows that Mr. Whittington, Sr., took the four pass books from the two banks and kept them in his personal possession during the remainder of his life. After his death they were found in his lock box or trunk in his home where he resided with his wife in Calvert County, Maryland."

For all practical purposes, all of the four pass books used the same language, but there is a difference between the two banks in the reading of the ledger sheets used by each of them to record the transaction among the banks' records. The ledger sheets of the County Bank use the identical words which appear on the pass book. However, neither the ledger sheets nor the signature cards of the National Bank show a trust to exist.

At Mr. Whittington's death, the appellant received the sum of $1,500.00 representing proceeds of an insurance policy on the life of the deceased; a nominal amount from a fraternal group and the sum of $2,000.00 that she had placed in the joint savings account with the deceased.

A will of the deceased, dated July 15, 1946, was admitted to probate by the Orphans' Court of Calvert County. The deceased devised an eighty-eight acre farm to his daughter and left to a nephew a second farm but conditioned the devise to the nephew upon his paying the sum of $1,000.00 annually to the widow of the decedent (appellant) and his allowing appellant the privilege of living in the home with the nephew. The residue of the estate was devised equally to his two sons (appellees). The inventories returned to the Orphans' Court disclose that the two farms are appraised at $13,200.00 and the personal estate at $12,016.45. The appellant renounced the will and will receive one-third of decedent's net estate.

## I

Appellant concedes that "the facts of this case would seem to indicate that the decedent did create a valid trust in the two accounts at the County Trust Company", but contends that the two accounts opened at the National Bank are not valid joint savings bank deposit trusts. The principle applicable to this issue has been concisely stated by Judge Forsythe in *Ragan v. Kelly*, 180 Md. 324, at 330-331, 24 A. 2d 289, at 293:

"The circumstances under which deposits were made vary in many instances, but certainly since the decisions of this court in the *Milholland-Whalen* Cases, reported in 89 Md. 199, 43 A. 45, 44 L. R. A. 208, and 89 Md. 212, 43 A. 43, 44 L. R. A. 205, the legal effect of an entry in a bank book similar to the entry in this case has definitely been settled. The general rule there adopted, and since followed, is that the entry, as it stands, is a sufficient declaration of a trust as it, unexplained, indicates an intention to create a trust. But the entry may be explained and the intention it indicates may be rebutted.

"In any particular case, the question whether a trust in law has been created effectually to vest the fund in the survivor depends entirely upon the actual intention of the original owner of the fund at the time he had

the entry in the bank book made." See also *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 134-135, 46 A. 2d 284, and cases there cited; *Grimm v. Virts,* 189 Md. 297, 55 A. 2d 716; *Collier v. Benjes,* 195 Md. 168, 177, 73 A. 2d 21; *Hancock v. Savings Bank of Baltimore,* 199 Md. 163, 170-171, 85 A. 2d 770, 772-773.

Appellant acknowledges that entries on the pass books at the National Bank do raise a rebuttable presumption that a trust was created but urges that this presumption is rebutted by an alleged lack of testimony that the decedent authorized the bank to create the trust accounts and by the signature cards in which the words "in trust" do not appear.

The principal difference between the form of account as stated in the passbooks and as stated on the signature cards, so far as material in this case, is that the words "in trust" appear in the passbooks and not on the signature cards. If this creates a conflict between the two, the form employed in the passbooks, though not signed by Mr. Whittington, would seem to be controlling in the light of the testimony of the bank officer who handled the opening of those accounts as to the relative importance and the respective functions of the passbooks and of the signature cards. The passbooks were delivered to Mr. Whittington simultaneously with the opening of the accounts, they were accepted by him, they were apparently the only records of the establishment and terms of the accounts which he kept in his possession and they were required for making any withdrawals.

The trial judge, after holding that the use of the "in trust" form in the passbooks created a presumption that a trust was intended and created, found from the use of this form and the testimony with regard to Mr. Whittington's discussion with an official of the National Bank and with regard to his previous full discussion of the trust form with a representative of the County Bank that Mr. Whittington intended that trusts should be created with the accounts at the National

Bank. This conclusion, we think, is supported by the evidence.

We accordingly regard all four of the savings accounts as creating trusts on substantially identical terms, each son being named as a joint beneficiary with his father in one account in each bank.

There is no evidence suggesting that the establishment of the trusts was due to any fraud or undue influence or breach of confidential relations as between either of the sons and his father, and the Chancellor found that the transactions "resulted from the positive independent desire and wish of the donor."

### II

This brings us to the ultimate question: Did the establishment of these savings account trusts constitute what is commonly called a fraud upon the marital rights of the surviving spouse? Notwithstanding the formal sufficiency of such trusts, they may be held invalid under some circumstances. *Mushaw v. Mushaw,* 183 Md. 511, 39 A. 2d 465.

The subject of fraud on marital rights has recently been carefully reviewed in the *Mushaw* case and in *Allender v. Allender,* 199 Md. 541, 87 A. 2d 608, and also in an Article entitled *"Inter Vivos Transfers in Violation of the Rights of Surviving Spouses",* by Melvin J. Sykes, Esq. in 10 *Md. Law Review* 1. Little would be gained by a repetition of the authorities referred to in the cases and article cited. The subject is one of difficulty and, at the present time, of uncertainty. The *Mushaw* case turned on the fact that the trust savings accounts there established completely stripped the widow of her marital rights in the personal property of her husband. The Court there said that "This may be a matter of degree, but it appears to be the only basis upon which the cases can be reconciled." In the *Allender* case, after referring to the *Mushaw* case and a number of earlier Maryland cases (including *Sturgis v. Citizens National Bank,* 152 Md. 654, 137 A. 378, in which case trust savings accounts were upheld), the Court said:

"It must be admitted, however, that the test of degree does not commend itself as a legal criterion. If the wife receives less than her legal share in the personal estate, it would seem to be quite immaterial that she is not wholly cut off, that she receives her dower rights in the real estate, or that she has resources of her own. On the other hand, as suggested in the *Mushaw* case, courts of equity have always inquired into the fairness, under all the circumstances, of transactions between persons in a confidential relation.

"The doctrine of fraud on marital rights represents an effort to balance the social and practical undesirability of restricting the free alienation of personal property against the desire to protect the legal share of a spouse. It has always been recognized that a husband, in the absence of statutory regulation like that in the case of dower, has an unqualified right to give away his personal property during his life time, even though the effect is to deprive the wife of her statutory share. But if the gift is not absolute and unconditional and the donor retains dominion and control over the property during his lifetime, the courts have held that the gift is colorable and may be set aside".

In New York, in cases in which a tentative (or "Totten") trust is challenged as being in fraud of marital rights, the test now seems to be established as being whether the trust is valid and effective or merely colorable or illusory. *In re Halpern's Estate,* 303 N. Y. 33, 100 N. E. 2d 120. In that case the motive of the husband in seeking to keep his money away from his wife did not defeat the validity of bank accounts established by the husband fifteen months before his death in the name of himself as trustee for an infant grandchild. The Court observed that "Unworthiness of motive could not make illusory an otherwise complete transfer." Nor did the virtual stripping of the wife's interest in his estate affect the result. The bank accounts aggregated about $14,000; the gross estate, exclusive of these accounts, was about $3,300.

In Maryland, the completeness of the transfer and the extent of control retained by the transferor, the motive of the transferor, participation by the transferee in the alleged fraud and the degree to which the surviving spouse is stripped of his or her interest in the estate of the decedent spouse have all been considered material, and no one test has been adopted to the exclusion of all other tests. As pointed out by Mr. Sykes in his article above referred to, there are several other factors which have been or may be considered as pertinent, such as the relative moral claims of the surviving spouse and of the transferees, other provisions for the surviving spouse, whether or not he or she has independent means and the interval of time between the transfer and the death of the transferor. There is no statute in Maryland comparable to that relating to the inheritance tax, (Code (1951), Article 81, Section 150,) which sets up any standard by which the effectiveness and treatment of *inter vivos* transfers should be determined insofar as the marital rights of a surviving spouse are concerned.

In the present case the widow receives a one-third interest in a gross estate appraised at approximately $25,000 of which about $13,000 consisted of realty and about $12,000 of personal property. In addition, she had received during her husband's lifetime $2,000 representing nearly one-fourth of the sale price of a farm, which she had put in a joint bank account in her name and her husband's. The four bank accounts in dispute aggregate roughly $17,000, and one-third of that amount is approximately $5,700. Whether the amount of the bank accounts in dispute should be reduced by $4,000 out of the proceeds of the sale of the farm as an offset against the $2,000 from that source already received by the wife, is perhaps a debatable question, which we do not think necessary to decide. (Compare *Jaworski v. Wisniewski,* 149 Md. 109, 131 A. 40.) Assuming that no such reduction should be made, we find that the widow is certainly not completely stripped of her marital rights

in her deceased husband's property, even though she does receive approximately forty per cent less than she would have received if the four savings account trusts had not been established.

On its facts this case is much closer to the *Allender* case and to *Sturgis v. Citizens National Bank*, 152 Md. 654, 137 A. 378, than to the *Mushaw* case. As was said in the *Sturgis* case, the husband "must have contemplated that it might reduce the total fund in which his wife would share at his death, for that would be the obvious consequence of any gift; but he had a right to deprive his wife of so much of his funds by a complete gift." The *Mushaw* case did not undertake to overrule the *Sturgis* case, but reached an opposite result frankly on the basis of a difference in degree. This was recognized in the *Allender* case, even though the test of degree was criticized. The *Allender* case repeated the suggestion made in the *Mushaw* case that courts of equity have always inquired into the fairness, under all the circumstances, of transactions between persons in a confidential relation. The confidential relation so referred to is that between the spouses, not that between the donor-spouse and the third party donee. In the latter type of situation the transaction to be tested is between the persons who are parties to the confidential relationship, and the familiar rules governing transactions between persons in confidential relations are easily applied. But where the confidential relation is between the spouses and the transaction under scrutiny is between one of the spouses and a third party, the application of the rules is not nearly so simple. The present case illustrates this fact. As between the husband-donor and the donees (who were his sons) no foundation for the invocation of the rules relating to confidential relations has been laid, nor is any fraud on the part of the donees shown as against either their father or their stepmother. The position of the sons may be somewhat analogous to that of persons dealing with a known fiduciary; but as was pointed out by the Supreme Court in *Securities &*

*Exchange Comm. v. Chenery Corp.*, 318 U. S. 80, 85-86, 63 S. Ct. 454, 87 L. Ed. 626, to call a man a fiduciary is only to begin analysis.

No general and completely satisfactory rule to determine the validity or invalidity of transfers alleged to be in fraud of marital rights has yet been evolved in this State. The test of degree has been recognized, and so have its shortcomings. It remains a very practical consideration among the facts and circumstances to be considered in connection with the completeness and genuineness of a transfer where the transferor, by naming himself as trustee and as a beneficiary, or by means of an agreement with his donees, has retained some control over the subject of the gift or trust under scrutiny. In the light of the family relationships of the parties involved in this case, in the absence of any fraud or undue influence practised by the decedent's sons and in view of the amount and proportion of the property formerly owned by the decedent which the widow will receive, we do not find any basis upon which the trusts created in these savings accounts should be stricken down. Accordingly the decree must be affirmed.

*Decree affirmed, with costs to the appellees.*