GIANAKOS, Executor, Etc. *v.* MAGIROS et al.

[No. 154, September Term, 1963.]

16

*Decided March 5, 1964.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, MARBURY and SYBERT, JJ.

*Konstantine J. Prevas,* with whom was *John C. Gianakos* on the brief, for the appellant.

*Melvin J. Sykes,* with whom was *William G. Kemp* on the brief, for the appellees.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal by the executor of the second wife of a decedent, who was substituted in her place as plaintiff, from an order dismissing an amended bill of complaint which sought to set aside, as in fraud of the marital rights of the second wife, a deed executed by the decedent about two and a half months before his second marriage. By this deed the decedent conveyed certain realty, in fee simple, to two of his sons by his first marriage, as joint tenants, reserving to himself a life estate with general powers of disposition over the property during his life. On the same day that the decedent executed the deed here involved he also conveyed (through a strawman transaction) title to a property in another county to his other son and to himself as joint tenants. This transfer is not attacked in this suit, and we are not informed whether it is under attack elsewhere. Facts concerning it are in evidence in this case, and were considered by the trial court. The Circuit Court found that there had been no fraud on the widow's marital rights and dismissed the bill.

The trial of the case extended over three days. We are indebted to counsel on both sides for presenting much of the evidence as a statement of undisputed facts (pursuant to Mary-

land Rule 828 g) and for holding down the length of the printed record extract. Judge Rollins wrote a careful and comprehensive opinion which deals with both the facts and the law of the case. His decision rests largely upon *Whittington v. Whittington,* 205 Md. 1, 106 A. 2d 72, which is our most recent case dealing extensively with the subject of fraud upon marital rights.

The decedent, George Magiros, was born on the island of Andros, Greece, in or about 1892, emigrated to the United States in 1910, and resided for some years in Ellicott City, Maryland. In 1916 he married his first wife, Anna Coroneos, and they had three children: Thomas G. (Thomas), born in 1924; John G. (John), born in 1925; and Peter, born in 1929. Thomas and Peter are the defendants-appellees in this case. John is not a party to this suit. (The conveyance from George to John made contemporaneously with the conveyance to Thomas and Peter will be referred to later.)

George's first wife died in 1931. In about 1933 George settled in Elkton with his two older sons and engaged in the restaurant business. Peter, the youngest son, continued to reside with a family in Ellicott City which had taken care of him since the time of his mother's death. The older boys helped their father in his business during their childhood and their high school years by working after school and in the summers. Peter also helped during summers and holidays while he was in high school and college. The relationship between George and his sons was always good, but George was "secretive" and not talkative and rarely discussed his personal or business affairs with them.

Each of the sons continued his education beyond high school. Thomas went to college for two years before entering military service for three years, 1943-1946. John received a degree in pharmacy and owns and operates a drug store in Ellicott City. Peter received a bachelor's degree in chemical engineering, spent about two years in military service, later received an M.A. degree, and has been employed successfully in engineering work in Houston, Texas, for eight years.

When Thomas was discharged from military service he applied for admission to a college in Indiana where he wished to

study air conditioning and refrigeration. At about that time George's partner left him, and at George's request Thomas abandoned his plans for further education and went to work with George in the restaurant business. He became an equal partner with his father in 1947 and continued in partnership with him until his father's death in 1961.

In or about 1940 George visited Greece, according to the testimony of his sister-in-law, Matina Psomas, to look over her niece with a view to matrimony, but the niece was too young for him. There is no indication that George gave any real thought to possible remarriage thereafter until 1947 or early 1948 when his much younger brother, Costas Magiros, who lived in Athens, visited George in Elkton. Costas tried to persuade George, who was then about fifty-six years old, that he should have someone to look after him in his aging years. At that time George was very much concerned over an investigation of his income taxes, and in 1949 he was fined and sentenced to two months' imprisonment for violation of the federal income tax laws. As to Costas' talks with George during his 1947 or 1948 visit and subsequent developments, we now quote from Judge Rollins' opinion in the Circuit Court:

"When marriage was suggested, George told him that it was his intention to settle his property on his children and that, at his age, he had no intention to marry. He did inquire about a girl from his home village on Andros, whom he had not seen for more than thirty years. With or without authority, Costas made an unsuccessful proposal of marriage through another person. From that time on, Costas initiated a matchmaking endeavor to find a bride for his brother. This connubial conspiracy involved him, a certain Katina Kouvatsou and her sister, Sophie Dimopoulou. The first step in their aggressive and progressive campaign was to forward George a picture of Sophie, but he did not seem interested and returned the picture.

"In 1949, Sophie was then 38 years of age. She had been married and in 1937 divorced, and thereafter resided with Mr. and Mrs. Kouvatsou. Due to the terrible financial and economic depression in Greece following the German-Italian occupation in the last war and thereafter, Sophie, like many others, could not find employment and was forced to continue to live

20

with the Kouvatsous. This family was also impoverished and her sojourn in the home was not pleasant, to say the least. Due to her divorce status, Sophie apparently had experienced difficulty in interesting eligible males. She showed determination, however, as events later showed. Her brother-in-law and sister lived in an apartment. Sophie was relegated to the basement and she could not appear when the brother-in-law was home. She did not dine with the family and when he was on the premises, she had to visit with a neighbor and could not return until she received a pre-arranged signal that Kouvatsou had left the apartment. It is stipulated that they were destitute, and evicted from the apartment for rental arrearage, and that only after Sophie's marriage to George, were they able to have a fine new house of their own and live in comparable ease and comfort, as the result of the benevolence of George and Sophie.

"Sophie initiated the correspondence between her and George under date of December 30th, 1948. The letters offered in evidence, except one from Costas to George, were written by Sophie to George. By March of 1949, the friendly conspirators were trying to influence George to join in an arrangement whereby Sophie would come to him via Canada. As late as July of 1950, Sophie's importunities continued, but the plan did not succeed. About this time, George did talk with his sister-in-law, Matina Psomas, about a possible visit to Greece, but the record demonstrates that he had no definite plans about Sophie, because he told the witness that when he met her, if he liked her, he might consider marriage; if he did not like her, he would return to this Country.

"On November 2, 1950, he executed the deeds to his sons conveying the Ellicott City property by straw deeds to himself and to his son, John, as joint tenants with no reservations or control for himself; and he conveyed the restaurant property on Route 40 in Elkton to Thomas and Peter as joint tenants, reserving unto himself a life estate with general powers of disposition. This plan of distribution of his realty to his sons (all except Leo's Restaurant) was conceived so as to afford him protection during his old age. He was fifty-nine then, and by

this arrangement, he would collect the rentals from John's property and his share of the profits from the partnership with Thomas and yet retain control of all during his final years. Obviously, it was also a disposition of property a cautious person would be expected to make in contemplation of an overseas venture.

"None of the children knew about these transfers. Thomas learned through an accountant employed by the partnership about two years later and later on he told Peter about the deed; and John did not know of the transfer to him until after the father's death.

"In December of 1950, the father told Thomas that he was going to New York and the son did not learn until January of 1951 that the father had gone to Greece. He took passage on a cruise ship and apparently toured the Mediterranean, debarking in Piraeus just before Christmas. Costas stated that George was not impressed with Sophie when he met her on December 31st at a New Year's celebration. George did agree to come to the home of Mrs. Kouvatsou three days later and as the result of these discussions, January 18th was decided as the date for the wedding. He gave Mrs. Kouvatsou $1500.00 in all to arrange for the ceremony. After they were married, they toured the Aegean Islands and George returned to this Country about four months later. Sophie came over sometime after that.

"It is stipulated that George and Sophie got along well together. The children accepted the marriage and felt that it was good for the father. George and his wife lived in an apartment connected with the restaurant, ate their meals there and she had the help of the general maid services provided for the restaurant-motel business. When she was mentally ill on two occasions, she was well cared for in a sanatarium with private nursing and lived quite comfortably. They had regular vacations together and in 1958 they spent eight months on an extended trip to Greece.

"George Magiros departed this life intestate on April 6, 1961. Sophie Magiros died on September 9, 1962, leaving a Will wherein she directed her Executor to convert all property into cash and to distribute the net estate equally to Mrs. Kouvatsou, to another sister and to a brother."

George retained actual control over the Ellicott City property, paying the taxes thereon and receiving the rents therefrom during his life, notwithstanding the conveyance to John and himself as joint tenants. Also, after the 1950 deed, George paid the taxes and took depreciation on "George's Restaurant" and on the adjacent motel which he built in 1953 at a cost of about $28,000 to $32,000 on land conveyed by the 1950 deed. He operated the motel as his own venture, apart from the partnership with Thomas. Thomas also established another restaurant of his own out of earnings and withdrawals from the partnership. George objected to the withdrawals and refused to permit Thomas to draw checks against partnership funds after about 1953.

Thomas took a very active part in the partnership business, and it was profitable to him and to his father and it was also beneficial to Sophie, who lived with George in an apartment adjoining the restaurant and took her meals there and continued to live there after George's death. During George's absences— once while he was serving his income tax sentence and on not infrequent occasions when, both before and after his second marriage, he would take a trip (apparently often not announced in advance)— Thomas would, of course, have full responsibility for the operation of the business. His share of the profits in at least one year was about $28,000. Sophie helped George at the motel by working as cashier. After George's death, Thomas allowed her to operate the motel for herself.

George's estate in which his widow had an unquestioned interest (sometimes referred to below as his "undisputed estate") consisted of the following at the appraised values thereof as filed in the Orphans' Court: [1]

| | |
|---|---|
| Personal property (including a debt of $16,283.86 due by Thomas) | $84,036.63 |
| Real property ("Leo's" Property and two lots) | 13,200.00 |
| Total ............................. | $97,236.63 |

---

1. The appellant has excepted to the valuations as being too low. So far as we are informed, his exceptions have not been acted upon.

[Brought forward—Total] .................. $ 97,236.63
    To this the appellant would add:
        Ellicott City Property, appraised value ..... 16,000.00
        George's Restaurant Property, appraised value  70,000.00

    Gross Estate on appellant's theory ......... $183,236.63
    Sophie's estate or property at the time of her death consisted
of:
    Cash on hand or in bank:
        Savings account .............. $8,471.38
        Checking account ............. 2,465.96
        Cash on hand ............... 1,249.79    $12,187.13
    One-third interest in George's gross undisputed
      estate ................................... 32,412.21
    United States Savings Bonds (maturity value,
      $6,500; current value not shown, estimated at
      approximately the mean of cost and redemption
      value), payable after Sophie's death to Katina
      Kouvatsou    5,400.00

        Total ............................. $49,999.34
    On the gross figures set forth above, the three sons would
receive from George:
    Two-thirds of his undisputed estate ......... $ 64,824.42
    Ellicott City property ..................... 16,000.00
    George's Restaurant property ............... 70,000.00

        Total ............................. $150,824.42

The above figures are, as indicated, gross figures, and make no allowance for expenses or taxes. The figures for Sophie's estate doubtless include some cash received after George's death from the operation of the motel which Thomas permitted her to continue and to conduct for her own account, from the time of George's death until her own, which included a period of five months after she had filed this suit against Thomas and Peter. She reported income of about $4,075 from this source for 1961. No figures are shown for the eight months or so of her operation of it in 1962, nor is there any showing of how much she saved or spent in either year. There was some evidence to indicate that George had about $5,000 in cash on hand at the time

of his death and that Sophie retained it, with Thomas' acquiescence and without his making any demand therefor. How much, if any, of that sum and how much of the later profits of the motel Sophie retained, we do not know. At a guess it may have amounted to $5,000, possibly somewhat more. All that Sophie had came to her· either through George or through the generosity of his sons, including any earnings to which her own efforts as cashier or as operator of the motel may have contributed.

Reference was made in the appellant's brief and in oral argument to the federal estate tax on George's estate. As a result of an inquiry from the bench, we are advised that the amount paid as such tax was $17,555.44 and we are further advised by the appellees' counsel that the appellees concede that they are liable, if the order of the Circuit Court is affirmed, to bear the burden of the federal estate tax in respect of the property here in suit in accordance with Sec. 162 of Art. 81 of the Code (1957), particularly under subsection (9) thereof, and so to relieve the undisputed estate of that burden. The basis upon which the federal estate tax was computed is not shown. The amount paid seems to indicate (based on rates of tax and credits for state death taxes under 26 U.S.C.A., §§ 2001 and 2011) an estate subject to federal estate tax of $90,210, after the specific exemption of $60,000. The sum of the specific exemption and of the taxable estate ($150,210 on our calculation) is the denominator in the contribution formula prescribed by Sec. 162(3)(c) of Art. 81. This figure can be approximated by taking George's as gross estate, which surely included his undisputed estate of $97,236.63 and the George's Restaurant property, at $70,000, and almost surely (we think) included the Ellicott City property, at $16,000, the sum of these items being $183,236.63, and by deducting therefrom, as the marital deduction allowable under 26 U.S.C.A., § 2056, Sophie's one third interest of $32,412.21 in George's undisputed estate. The balance of $150,824.42 could easily be reduced by other allowable deductions to $150,210, which is the figure apparently used by the appellees as the denominator in applying the above contribution formula.

Their figures show that Sophie's estate would receive a bene-

fit of $2,730.68 from their federal estate tax contribution on account of the Restaurant property. This indicates a total contribution of $8,192.04 (Sophie's benefit being one-third). This is equal to 70,000/150,210, or 46.6%, of the total tax paid. There is no such concession as to the Ellicott City property, record title to which is now in John, who is not a party. If the concession by the appellees is soundly based, and if the Ellicott City property is included in the gross estate at $16,000, a similar computation would make the recipient of the Ellicott City property liable to contribute 16,000/150,210, or 10.65% of the federal estate tax. Adding these two together the sons would then pay 57.25% of the federal estate tax, and this would amount to $10,050.49. The balance falling on the undisputed estate would be $7,504.95, one-third of which ($2,501.65) would fall on Sophie's share and two-thirds ($5,003.30) would fall on the sons' share.

However, on the figures and concession now before us, we cannot be sure of this. We, therefore, examine the effect of the federal estate tax only on the basis of the appellees' being responsible for 46.6% thereof. The appellant's counsel has submitted figures showing a distribution to Sophie's estate from George's undisputed estate of $14,400 ($10,000 in cash, $4,400 in real estate) and an anticipated future distribution of $14,-465.67, being one-third of the balance remaining for distribution after payment of the federal estate tax, making a total present and prospective distribution to Sophie's estate from George's undisputed estate of $28,865.67. To this should be added a credit of $2,730.68 by reason of Sophie's share being relieved by the appellees of the federal estate tax to that extent. (There may also be an adjustment on account of her widow's allowance of $225.00, which would produce net to her an additional amount of $150.00, but we do not take that into our figures below.) With 46.6% of the federal estate tax being borne by the appellees in relief of George's undisputed estate and using the appellant's figures as to distribution, adjusted to reflect this tax credit, and also using the figures given above as to other assets of Sophie's we have:

Sophie's estate and property:
Distributive share of George's undisputed estate—

| | | |
|---|---|---|
| As computed by appellant | $28,865.67 | |
| Plus adjustment a/c estate tax | 2,730.68 | $31,596.35 |
| Cash on hand and in bank .................. | | 12,187.13 |
| U.S. Savings Bonds (estimated) ............ | | 5,400.00 |
| Total .......................... | | $49,183.48 |

The sons' collective interests in George's estate and in the properties conveyed to them work out as follows on like figures:

| | | |
|---|---|---|
| Two-thirds of past and anticipated distributions from George's un-disputed estate .............. | $57,731.34 | |
| Plus adjustment a/c estate tax | 5,461.36 | $63,192.70 |
| Ellicott City property .................... | | 16,000.00 |
| George's Restaurant property | $70,000.00 | |
| Less estate tax contribution | 8,192.04 | 61,807.96 |
| Total ........................ | | $141,000.66 |

After this lengthy statement of facts and figures we turn to the appellant's contentions and the questions of law presented.

The appellant attacks the validity of the deed to the appellees on the grounds that there was no delivery and that there was no acceptance. These contentions, if sound, would mean that George still owned the George's Restaurant property at the time of his death, and hence that it would descend as real estate in intestacy, quite apart from whether the deed was in fraud of Sophie's marital rights. Both delivery and acceptance are ordinarily requisite to the validity of a deed, but what is sufficient to meet such requirements depends largely on the facts of each case.

With regard to delivery, "no particular form of procedure is necessary to effect a delivery; it may be by words or acts, or by both combined; but in all cases the intention that it shall be a delivery must exist * * *." *Carson v. Phelps*, 40 Md. 73, 97. And in *Stewart v. Redditt*, 3 Md. 67, 79, in answering a contention that delivery had not been proved, it was said: "The delivery may be either actual or verbal, and it is sufficient if

there be an intention or assent of the mind, on the part of the grantor, to treat the deed as his. *Byers v. McClanahan,* 6 G. & J. 250 [at 256]. The instrument in this case was duly acknowledged and recorded, and whether the law requires these formalities or not, to make this a valid deed, they are, nevertheless, sufficient to warrant the presumption of a legal delivery by the grantor. The clerk after he has recorded a deed must return the same to the grantee, who is the proper party to receive it, and therefore the possession of the clerk, under such circumstances, will be regarded as the possession of the grantee." Subsequent cases giving great weight to recording as supporting a finding or conclusion that there had been delivery, though manual delivery to the grantee was not proven, include *Hutchins v. Dixon,* 11 Md. 29, at 41; *Hartman v. Thompson,* 104 Md. 389, at 408, 65 A. 117; and *Houlton v. Houlton,* 119 Md. 180, at 184, 186, 86 A. 514. It has also been clearly recognized in *Buchwald v. Buchwald,* 175 Md. 115, at 120, 199 A. 800, that manual delivery to the grantee is not necessary.

It is recognized that there has been a consummated delivery when the instrument has passed from the grantor, without right of recall, to the grantee or to some person for his use. *Duer v. James,* 42 Md. 492, at 496; *Hearn v. Purnell,* 110 Md. 458, 465, 72 A. 906; *Clark v. Creswell,* 112 Md. 339, at 342, 76 A. 579; *Renehan v. McAvoy,* 116 Md. 356, at 359, 81 A. 586; *Houlton v. Houlton, supra; Buchwald v. Buchwald, supra.* (In several of these cases the rule was stated, but was not found applicable to the facts.) Cf. *Owings v. Owings,* 233 Md. 357, 196 A. 2d 908, 911-12.

In the instant case the deeds to George's sons were sent or delivered by his attorneys (obviously, we think, in accordance with his instructions), to the clerks of the courts of Cecil and Howard Counties, respectively, for recording and were recorded, one on November 10th, the other on November 13th, 1950, and were thereafter returned to counsel. George actually produced the deed to the appellees in 1952 at a conference with his accountant and Thomas when the accountant noticed that the George's Restaurant tax bills were in different names, and this was when Thomas first learned of the deed. At that time

George stated that he had made a "property transfer to the boys." Peter learned of this conversation from Thomas several years later. What ultimately became of the deeds does not appear.

We think that George's delivery of the appellees' deed to his attorneys with instructions to have it recorded, followed by their causing it to be recorded, still later followed by his acknowledgment of the deed with knowledge (which would be apparent from the clerk's notation on it) that it had been recorded are more than sufficient to establish delivery in the light of the authorities above cited. Certainly after it had been recorded by his direction, it is difficult to see how George retained the right to recall it, and his intention that it should be operative at once seems clear. We find it unnecessary to pass upon a contention of the appellees which would, in effect, make the timely recording of a duly acknowledged deed *ipso facto,* by virtue of Sec. 11 of Art. 21 of the Code (1957), enough to pass title, whether as importing delivery, or as dispensing with any need for delivery.

The appellant's contention that there was no acceptance is, we think, without force. The appellant seems at one point in his brief to concede that there was an acceptance when Thomas was informed of the deed in 1952. We think that since the deed was obviously beneficial to the grantees, acceptance before then is to be presumed, even though the grantees did not know of the conveyance. *Clark v. Creswell, supra,* 112 Md. at 342; *Houlton v. Houlton, supra,* 119 Md. at 187; *Allender v. Allender,* 199 Md. 541, at 547, 87 A. 2d 608 (gift of personalty, same rule applied).

The appellant attacks the Chancellor's findings that George's conveyances to his sons were made pursuant to a plan and that the plan was for George's protection in his old age. We are unable to discern why this division of most of George's real estate was not a part of a plan. It was also designed to retain for him some interest in and control over these properties in his old age. Whether it was necessary or was the best plan for such a purpose is beside the point. The plan was put into effect at a time when George was contemplating the possibility of remarriage, even though he was not engaged and had not

even decided whom he wanted to marry, if he should marry at all. There is room for question as to whether the situation then was such as to make the rules respecting fraud on marital rights applicable at all. The appellant's case (apart from the claim of invalidity of the deed due to lack of delivery or acceptance, which we have rejected) is founded upon the theory that these rules were applicable, and the appellees have not strenuously contended to the contrary. We shall assume, without deciding, that the rules were applicable and will consider the main question which has been presented—whether the conveyances to the appellees violated Sophie's marital rights.

In *Whittington v. Whittington, supra,* 205 Md. 1, 106 A. 2d 72, we undertook to review our authorities on the subject of fraud on marital rights and to deduce therefrom some guides to the solution of these problems. Maryland is by no means the only jurisdiction to have difficulty with this subject, and a number of different criteria are invoked here and elsewhere with varying emphasis on one criterion or another. See Macdonald, *"Fraud on the Widow's Share,"* Michigan Legal Studies (1960), which in Appendix E lists cases involving alleged evasion of the widow's rights through *inter vivos* gifts, or other related cases, or (as to almost every state) both, from every one of the states of the Union, except Alaska and Montana (the one Hawaiian case having been decided before statehood), and from the District of Columbia and Puerto Rico, plus cases from England, Australia, Canada and New Zealand. Chapter 1 is appropriately entitled "The Existing Confusion."

An excursion into the law of other jurisdictions seems neither necessary nor helpful in the solution of the problem before us. We agree with the learned trial judge that the controlling rules are stated in *Whittington.* In that case we said (205 Md. at 12) : "In Maryland, the completeness of the transfer and the extent of control retained by the transferor, the motive of the transferor, participation by the transferee in the alleged fraud and the degree to which the surviving spouse is stripped of his or her interest in the estate of the decedent spouse have all been considered material, and no one test has been adopted to the exclusion of all other tests. As pointed out by Mr. Sykes in his article above referred to [Inter Vivos Transfers in Vio-

lation of the Rights of Surviving Spouses, 10 Md. L. Rev. 1], there are several other factors which have been or may be considered as pertinent, such as the relative moral claims of the surviving spouse and of the transferees, other provisions for the surviving spouse, whether or not he or she has independent means and the interval of time between the transfer and the death of the transferor." We also noted the absence of any statutory provision dealing with *inter vivos* transfers affecting the marital rights of a surviving spouse, such as we have with regard to *inter vivos* transfers and the inheritance tax (Code (1957), Art. 81, § 151).

In *Whittington* the most important single factor was the degree to which the widow's share in the estate was reduced by the transactions under attack, but the broad scope of matters to be considered is evident from the above quotation. Macdonald, *op. cit. supra,* seems at least to find less fault with such an approach than with others. He says (at p. 5) : "There can be no serious criticism of a test that weighs all the circumstances, considers all the equities."

The Chancellor assumed, without deciding, that the father's antenuptial transfer of part of his property was for the purpose of protecting him and his children by his first marriage from an improvident second marriage. He found that the sons had not participated in any way in inducing the transfers, that the time interval between the transfers and the time of George's death was eleven years, and that George's motive was not improper. The Chancellor pointed out that George wanted John to have the Ellicott City property as surviving joint tenant after George's death, that he equalized that gift with a gift of the George's Restaurant property to Thomas and Peter as joint tenants, and that George did not transfer his other restaurant property or his interest in the partnership with Thomas, and that it was to George's "interest to retain control over Thomas in the business and over the real estate used therein by reserving" to himself a life estate, with certain powers during his life. These were "to lease, mortgage, deed or in any other wise encumber the property absolutely." (The power to "deed" seems to be limited by the words "or in any other wise encumber," and hence not to be a power to sell or give away

the property. It may have been intended to apply to a deed of trust in the nature of a mortgage.) The Chancellor stated: "Thomas was necessary to him [George] to assure the continued running of the business and the father's livelihood, whether he remained single in his declining years or married some woman in Greece. To the time of his death, he made no effort to change the legal ownership of the restaurant property * * *, and largely through Thomas' efforts, the business prospered. Thus, the father was able to accumulate a sizeable estate * * * in which his widow shared with the sons."

The Chancellor also found that both the second wife and the sons had strong moral claims upon the decedent's generosity, and that the "sons had a strong moral claim upon the father for the protection he sought to give them in the deed prior to his 1950 visit to Greece. They had been loyal and faithful to the father, especially Thomas, who sacrificed his education to become his father's partner. It is true that he benefited materially, but so did the father through the efforts of both. All of the sons helped in the business during vacation periods in their school years." He concluded that "with respect to the transfer of the restaurant property, the moral claim of the sons outweighs the moral claim of the wife."

We think that there was no showing of any actual fraudulent intent on George's part in making the conveyance or in the extent of the control which he retained. Every transfer of property by gift by a married man or by a man about to marry, of course, reduces the amount of property in which his prospective widow may share by intestacy or renunciation (or for that matter by devise or legacy from him) ; but certainly not every such transfer amounts to a fraud on his spouse's or intended spouse's marital rights. In the present case, the extent to which the transfers (only one of which is here under attack) reduced George's estate and the scope of his reserved interest in and powers of control over the George's Restaurant property are the principal factors tending to support the appellant's claim of fraud on marital rights. We agree with the Chancellor, however, that they are not sufficient. As we have seen, George had a sound business reason for wishing to keep Thomas active in the business with him and for wishing to

retain a life interest and considerable power over the real estate. *Whittington* and *Allender* both make it clear that retention of control does not in and of itself make the transaction a sham and establish a fraud on marital rights, and we see no reason why it should do so here.

We find no force in the appellant's contention that because the property here involved is real estate, we should reach a different conclusion on this matter than we might with regard to personal property. As a practical matter, cases in which fraud on marital rights is alleged much more frequently involve personal property than real, probably because even where title is in the husband alone, dower rights are usually effective to prevent a transfer of realty after marriage without the wife's knowledge and joinder. There is no such safeguard or impediment so far as record title is concerned where the transfer is made when marriage is only contemplated. However, it is not dower rights that we are here concerned with at all; it is the widow's statutory share in intestacy. If one thing is clear in our modern legislation with regard to the descent of realty, it is that the descent of realty has been assimilated to the distribution of personal property, and not the converse. See *Trotter v. Lewis,* 185 Md. 528, 45 A. 2d 329; *Kreamer v. Hitchcock,* 207 Md. 454, 115 A. 2d 255. We, therefore, are of the opinion that the same rules should apply to realty as to personalty in this field.

With regard to the question of the degree to which Sophie's share of George's property has been reduced, we think that the figures given in our statement of facts show that it is not so great as to amount to a fraud upon her rights. We are trying to take all equitable considerations fairly into account and for that reason we are not disposed to disregard that part of Sophie's estate which may be attributable to Thomas' and Peter's generosity towards her as George's widow. Sophie had no independent means of her own; all that she had came directly or indirectly through George. We have already given figures as to what Sophie received and retained from George and his estate (including any profit from the motel, thanks to the sons) before as well as after allocation to the George's Restaurant property of the federal estate tax allocable thereto. Sophie

clearly has not been stripped of any share of his estate. What she has received from him (and his sons) and retained, plus her share of his undisputed estate, amounts to about $49,000 after allocation of the federal estate tax attributable to George's Restaurant to that property. If that property and the Ellicott City property were brought into George's gross estate, that estate would be about $183,236, as we have seen. If we deduct therefrom only the amount of the federal estate tax paid, approximately $17,555 (and we have no other figures as to deductions) George's net estate would be about $165,681, one-third of which would be $53,227. Adding to this approximately $12,200 representing cash on hand and in bank, and $5,400 in savings bonds, the total would be $70,827, as against about $49,000. The difference is $21,827, which is slightly more than 30% of $70,827. If we should take as much as $7,500 out of the above cash item of $12,200 included in the above $70,827, because it may have been derived from the generosity of the sons and not of the father, and if we make a like deduction from the above $49,000 figure for Sophie's assets, we have $63,327 as against $41,500. The difference between these two is, of course, also $21,827, and it amounts to about 34% of $63,327. If we took simply the shares of George's estate distributable to Sophie, we should have $53,227 as against approximately $31,596. The difference is $21,631 and this amounts to about 40.6% of $53,227, almost exactly the same percentage of reduction as was involved in *Whittington*. We think the provisions for the widow not unreasonable.

In closing, we quote the Chancellors' concluding statement which is a paraphrase of the conclusion of this Court's opinion in *Whittington*: "In the light of the family relationships of the parties involved in this case, in the absence of any fraud or undue influence practiced by the decedent's sons, and in view of the amount and proportion of the property formerly owned by the decedent, which the widow's estate will receive, this Court does not find any basis upon which the gift to the sons by the father of the restaurant-motel property should be set aside."

*Order affirmed; the appellant to pay the costs.*