KLOSIEWSKI, INDIVIDUALLY, AND ADMINISTRATRIX, ETC., *v.* SLOVAN BUILDING & LOAN ASSOCIATION, ET AL.

[No. 405, September Term, 1966.]

*Decided June 6, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*Richard R. Beauchemin* for appellant.

*I. Duke Avnet,* with whom were *Avnet & Avnet* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

In 1925 Kazimierz Klosiewski (Casimir) and Anna, his wife, had $200 on deposit with Kosciuszko Permanent Loan and Savings Association. By 1930 the balance had risen to $1,800. When Anna died in January 1937 it had dwindled to $414. They had no children.

Casimir married another Anna in July 1945. He was 55 at the time. She was a 46 year old widow with a married daughter. She had worked for some years before she married Casimir and she continued working after their marriage. In October of the year of their marriage he arranged the transfer of his home at 4908 Pennington Avenue from his name to the names of himself and Anna as tenants by the entireties. During 1945 there was on deposit in the account only $230. At or about this time he made her the beneficiary of a $3,000 life insurance policy.

In June 1948 Casimir instructed Kosciuszko to change the account from his single name to himself, in trust for himself and Eva Ulatowska (his sister), joint owners, the balance at

84

the death of either to belong to the survivor, subject only to his order. At that time the balance, after a deposit of $73.60, was $500.

In August 1950, after his sister's death, he had the account changed so that the names of her children would be substituted for her name. The sons were Joseph and Edward. The daughters were Gertrude, Ida and Blanche. At that time the balance on deposit was $1,023.

In October 1954 Casimir opened an account with Slovan Building and Loan Association in his own name. The initial deposit was $200. In December 1958 he had the names of his nieces and nephews added so as to make the Slovan account conform with the Kosciuszko account.

When Casimir died on 9 January 1965 the balance in the Kosciuszko account was $5,736.30. In the Slovan account there was $1,854.96.

If tender and romantic sentiments prompted the marriage of Casimir and Anna II they soon subsided. Their life lapsed into a dull, cold routine punctuated only by occasional outbursts of nattering hostility. She left him three times, she said. He made her pay part of the taxes and the gas and electric bills. She bought her own food and kept it in her refrigerator. He kept his food in his refrigerator. She complained that when she would go to visit her daughter he would eat her food. The Ulatowska girls said they and their brothers were close to their uncle. They mentioned the "coldness" between him and Anna. Blanche related Anna's complaint that Casimir "was stingy * * * [that] he wouldn't give her nothing to eat" and that she "had to depend on her daughter to feed her." Gertrude described their relationship as being "funny * * * like a movie." She said "they were always bickering back and forth. She [Anna] would say 'Shut up' to him and he would say 'Shut up' to her, and they would go on and go on and on."

When Casimir and Anna were married he was employed as a janitor by a Baltimore branch of the DuPont Company. He kept on working until physical disability forced his retirement in November 1950. A representative of the company said "he had been ill for some time * * * that he had an infarct of the heart, chronic bronchitis, embolism, bursitis of both legs,

and a hernia on the left side." There was also some loss of hearing. His monthly pension of $66.03 was increased to $67 in May 1954. When he became eligible, a few years later, he received an additional $77.50 from Social Security.

Anna stopped working in 1956 and not long thereafter she too began receiving Social Security payments. She said she took care of the home, cooked and did washing. She claimed he did not support her, that he put his pension money in the bank for "his nieces and nephews." As Blanche put it "it was just that she was doing without and she kept throwing it up to us that she was doing without so much and we would get everything. That was the whole trouble." Actually the last deposit in the Kosciuszko account was made 8 September 1953, 11 years before Casimir's death. At that time the balance was $3,400. The last deposit in the Slovan account was made 3 years before his death. Anna admitted Casimir had told her about the accounts several years before his death. Gertrude said Casimir told her [Gertrude] about the accounts. It seems likely she told the others.

Immediately after Casimir's death, Anna filed a bill of complaint in the Circuit Court No. 2 of Baltimore City, asking the court to declare the two accounts to be assets of Casimir's estate. She alleged her deceased husband's purpose was "to fraudulently deprive" her of her "marital rights." The case was tried before Judge Harris in May 1966. This is Anna's appeal from his order dismissing her bill of complaint.

Our decision here will be controlled by *Whittington v. Whittington,* 205 Md. 1, 12, 106 A. 2d 72 (1954). Chief Judge Brune, who delivered the Court's opinion in *Whittington,* said:

> "In Maryland, the completeness of the transfer and the extent of control retained by the transferor, the motive of the transferor, participation by the transferee in the alleged fraud and the degree to which the surviving spouse is stripped of his or her interest in the estate of the decedent spouse have all been considered material, and no one test has been adopted to the exclusion of all other tests. As pointed out by Mr. Sykes in his article above referred to [Sykes, *Inter*

*Vivos Transfers in Violation of the Rights of Surviving Spouses,* 10 Md. L. R. 1], there are several other factors which have been or may be considered as pertinent, such as the relative moral claims of the surviving spouse and of the transferees, other provisions for the surviving spouse, whether or not he or she has independent means and the interval of time between the transfer and the death of the transferor."

It appears to be conceded that there was a complete absence of any fraud or undue influence on the part of the nieces and nephews and the chancellor so found. Anna's argument that the accounts were a fraud upon her marital rights assumes that the $5,736 in the Kosciuszko account at Casimir's death had been there during all of their married life. In the first place, it will be recalled, the account was in existence 20 years before they were married. Furthermore, at the time of their marriage there was only $230 on deposit. In 1948 when Casimir added his sister's name the balance had increased to but $500. In 1950, the year of his retirement and the year the nephews and nieces were included, the total amount was $1,023. By the fall of 1953 the balance had grown to $3,400. It is significant, we think, that Casimir never again made a deposit to that account. Accumulated dividends made up the balance. The Slovan account was opened nine years after their marriage. The initial deposit was only $200. The nephews and nieces were added in 1958 and his last deposit was in April 1962, three years before his death and about the time he told her of the existence of the accounts. It would surely be stretching a point to say that at any time before 1950 Casimir had perpetrated a fraud on Anna's marital rights. Nor is it at all likely that such a thing had come to pass by the fall of 1953. To find that fraud had been accomplished at any time thereafter, in respect of the Kosciuszko account, one would be obliged to attribute to the accumulation of dividends far more than seems justified. There was never enough in the Slovan account to make fraud a serious possibility.

The chancellor found, and we agree, that there was a close relationship between Casimir and his sister, and her children, and that they were "clearly far more friendly and helpful to

him than was his wife." We think it fair to say that they were fond of him and generally solicitous of his welfare and that these sentiments transcended any prospect of receiving a part of his modest estate. How much of a "moral claim" they may have had is, of course, beyond saying, but they certainly cannot be cast as strangers.

We do not think this case requires an extended discussion of the "test of degree" such as was undertaken by Judge Brune in *Whittington, supra,* and in *Gianakos v. Magiros,* 234 Md. 14, 197 A. 2d 897 (1964). It needs but brief reflection to realize that this childless, illiterate old man's obvious purpose was to divide his belongings equally between his widow and the children of his sister. The widow would get the house and the insurance; the nephews and nieces would get the money. The gross value of the estate, including the house,[1] the insurance and the two accounts was between $16,000 and $18,000. The value of the house and the insurance was between $8,000 and $9,000. The chancellor found that Anna received 36% of the gross estate and if this is not entirely accurate, as she contends, it is very nearly so. It will be observed, of course, that Anna's percentage is more favorable than the percentages of the widow in *Whittington, supra,* and the estate of the widow in *Gianakos, supra.*

Anna contends the chancellor made a finding that there was a valid gift inter vivos of the two accounts. We see nothing in the chancellor's opinion to indicate that Casimir attempted anything more than the creation of typical savings bank trusts and that his attempt was successful. The law applicable to the facts and circumstances of the instant case is so well settled that further discussion is unnecessary. In fact, Judge Brune reviewed the pertinent decisions of this Court in *Whittington, supra.*

To conclude this opinion we can do no better than adopt the concluding paragraph of *Whittington.* Judge Brune's language is especially appropriate to the situation here:

---

1. Anna complained that the house, owned by the entireties, should not have been included. We think its inclusion in the gross estate, for the purposes of this case, is not improper.

"No general and completely satisfactory rule to determine the validity or invalidity of transfers alleged to be in fraud of marital rights has yet been evolved in this State. The test of degree has been recognized, and so have its shortcomings. It remains a very practical consideration among the facts and circumstances to be considered in connection with the completeness and genuineness of a transfer where the transferor, by naming himself as trustee and as a beneficiary, or by means of an agreement with his donees, has retained some control over the subject of the gift or trust under scrutiny. In the light of the family relationships of the parties involved in this case, in the absence of any fraud or undue influence practised by the decedent's sons and in view of the amount and proportion of the property formerly owned by the decedent which the widow will receive, we do not find any basis upon which the trusts created in these savings accounts should be stricken down. Accordingly the decree must be affirmed." *Id*. at 14.

*Decree affirmed.*
*Costs to be paid by appellant.*