## ESTHER B. LEVY *v.* BESSIE SHERMAN, ET AL

[No. 50, January Term, 1945.]

*Decided June 14, 1945.*

The cause was' argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON and MARKELL, JJ.

*Abram C. Joseph,* with whom was *Jacob A. Gross* on the brief, for the appellant.

*H. Mortimer Kremer* for the appellees.

GRASON, J., delivered the opinion of the Court.

This appeal brings up for review the action of the Circuit Court of Baltimore City in decreeing that the bill of complaint of the appellant be dismissed, with costs to the appellees.

The principal object of the bill was to have the Court declare null and void and of no effect an antenuptial agreement entered into by the appellant and her deceased husband, Joseph Levy. The agreement may be summarized as follows: It states it was made in contemplation of marriage; states that Levy had fully informed appellant of his financial standing, amount of his assets, liabilities and income, and that Levy desired to make a fair and reasonable provision for the appellant in lieu of her rights after marriage. It provides, in case appellant survive Levy, that she receive all household furniture and one thousand dollars. In it appellant waives all rights as widow in the property he then possessed or would acquire in the future, and it provides that she would join in any instrument with Levy to divest her of dower in any property he wished to convey. It is dated December 17, 1925, signed and sealed by both parties and acknowledged on the same day before a notary public, and duly recorded among the Land Records of Baltimore City on December 19, 1925.

The parties were married on December 20, 1925, and the bill avers that they had been engaged to be married for some two weeks prior to the marriage. At the time of the execution of the antenuptial agreement, Levy was possessed of leasehold properties which the real estate experts testified were worth $23,800, subject to mortgages aggregating $16,487.68. Levy's equity in these properties at that time was worth $7,312.32. The cash which Levy had on deposit in bank at the time together with his equity in these properties, establishes his net worth at the date of the agreement to be around $10,000. Since his death his administrators, his two daughters, who are the sole appellees in this action, sold, through the Orphans' Court, his leasehold properties, and the net aggregate amount from these sales was $14,500. The cash on deposit to Levy's accounts in banks at the time of his death was trivial, amounting to something less than $200.

The bill charges that Levy was guilty of fraud in procuring the appellant to sign the antenuptial agreement.

It recites that he had an appointment to take appellant to see a moving picture, but that instead, he took her to the office of one Wolpert, whom she did not know before that time, nor has seen since; that almost immediately upon entering Wolpert's office, he produced the ante-nuptial agreement and she was asked to sign it. Upon inquiring what it was, Levy stated that it was a paper necessary for him to have in order to carry on his business after they were married; and, having full faith and confidence in her fiance, she signed and acknowledged the agreement. Their acknowledgments of the instruments were taken by Wolpert as notary public. The whole matter only took a very few minutes, and they left the office to go to the theatre. Appellant avers that at the time she executed the agreement she did not know its contents and relied implicitly upon the statement of her fiance of what it was, and that she did not know its contents until after the death of Levy. She avers that she owned no property at all at that time and that the allowance provided for her in the instrument is so disproportionate to the worth of Levy at the time, that it implies bad faith on the part of Levy and that the instrument was intended to deprive her of her future marital rights. She lived with Levy, after the marriage, until his death, a period of about eighteen years.

The answer admits the marriage, the death of Levy, the execution of the antenuptial agreement, but denies all of the other material allegations of the bill and charges appellant with laches. Testimony was taken in open court, solicitors heard, and thereafter the decree was filed.

At the outset of this opinion it may be said that ante-nuptial agreements, in contemplation of marriage, are lawful. *Naill v. Maurer*, 25 Md. 532; *Busey Ex. v. Mc-Curley*, 61 Md. 436, 48 Am. Rep. 117; *Schnepfe v. Schnepfe*, 124 Md. 330, 92 A. 891, Ann. Cas. 1916 D, 988; *Wlodarek v. Wlodarek*, 167 Md. 556, 175 A. 455; 26 *Am. Jur., Husband and Wife*, Section 275, page 882.

"An antenuptial settlement or agreement to the extent that it is executory must be supported by consideration, but marriage itself is consideration for such a settlement or agreement, and indeed, it is said to be perhaps the most valuable and highly respected consideration of the law in this as well as other cases." 26 *Am. Jur.*, Sec. 277, page 884 (see note 2 for cases) ; *Braecklein v. McNamara*, 147 Md. 17, at page 21, 127 A. 497; *Michael v. Morey*, 26 Md. 239, 90 Am. Dec. 106.

An important question in this case is whether, at the time of the execution of the antenuptial agreement, a confidential relationship existed. That is, whether the law, under the relations existing between the parties, and the circumstances surrounding the transaction at the time of the execution of the antenuptial contract, would impute to Levy an influence over the appellant that would cast upon him, and those holding by or through him, the burden of showing that the contract was fair and reasonable. Some cases hold that unless the parties to such an instrument were engaged to be married at the time of its execution, a confidential relationship does not arise, and even though the man and the woman contemplate marriage they deal with each other at arm's length, like two astute business men, each endeavoring to gain an advantage over the other in the matter. All the cases hold that where the parties, at the time of the execution of the antenuptial contract, were engaged, a confidential relationship exists, and it is held that after the instrument is signed by the parties they become engaged, even though such was not the case a minute or two before the execution of the contract.

In 41 *C. J. S., Husband and Wife*, Sec. 97, under the heading "Presumptions and Burden of Proof" at page 571, it is said:

"The rule under which inadequacy or disproportion of the provision for the wife raises a presumption against the husband and throws the burden on him or on those claiming under him of proving fairness or knowledge

applies where the parties were engaged to be married at the time of the agreement and a confidential relationship existed between them."

All of the cases cited to support this text are Illinois cases, with the exception of *Baker v. Baker,* 24 Tenn. App. 220, 142 S. W. 2d 737. In that case the agreement was entered into after their engagement to marry. *Yockey v. Marion,* 269 Ill. 342, 110 N. E. 34; *Mann v. Mann,* 270 Ill. 83, 110 N. E. 345; *Kuhnen v. Kuhnen,* 351 Ill. 591, 184 N. E. 874.

In *Williamson v. First National Bank,* 111 W. Va. 720, 164 S. E. 777, 779, it is said:

"The contract recites that the parties 'are about to enter into a contract of marriage.' So far as appears from that document, no marriage agreement had been entered into before it was signed, and for aught that appears from that instrument its execution was a preliminary step to the engagement to marry. Whatever may be the usual custom as to the time antenuptial agreements are made, it is not universally true that they are made after betrothal. It may well be, and undoubtedly is true, that a man and a woman may contemplate marriage but one or both of them have reasons why it is desirable, not only before entering into the marriage relation but before there is any agreement to marry, to settle the rights of each in the estate and property of the other by an antenuptial agreement, and this step precedes and is preliminary to the contract of marriage. In cases of that character there will be no confidential relation existing until after the contemplated contract is made, and the law governing the rights of the parties under such contracts would be the same as is applicable to contracts entered into by persons between whom there exists no confidential or fiduciary relation."

*In re Malchow's Estate,* 143 Minn. 53, 172 N. W. 915, 917, it is said:

"In addition to inadequacy of consideration, there must be a confidential relationship between the parties before fraud will be inferred. Persons under contract to

intermarry are presumed to stand in a confidential relation to each other. They are not in the same category as buyers and sellers who deal at arm's length. *Kline v. Kline;* 57 Pa. 120, 98 Am. Dec. 206; *Graham v. Graham,* 143 N. Y. 573, 38 N. E. 722; *Barker v. Barker,* 126 Ala. 503, 28 So. 587; 1 *Page on Contracts,* 190. But the presumption is not conclusive that a man obtains the confidence of or gains a controlling influence over the woman he is pledged to marry merely because they have agreed to intermarry. Marriages of convenience take place in which the impulses of sentiment play no part. They are of a purely business character. The woman may have no greater confidence in her intended husband than she has in other acquaintances, and he may have no greater influence over her actions than they have. Such seems to have been the case here."

In *Pierce v. Pierce,* 71 N. Y. 154, 158, 27 Am. Rep. 22, the contract was made in contemplation of marriage. The Court said:

"The relationship of parties who are about to enter into the married state, is one of mutual confidence, and far different from that of those who are dealing with each other at arms length. This is especially the case on the part of the woman; and it is the duty of each to be frank and unreserved when about to enter into an antenuptial contract, by a full disclosure of all facts and circumstances which may in any way affect the agreement. *Kline v. Kline,* 57 Pa. 120."

Although it does not appear from the opinion the parties were engaged prior to the execution of the instrument, the Court said:

"That the deceased, taking advantage of the confidential relationship existing between him and the respondent, who was the intended wife of the deceased, he was chargeable with fraud and misrepresentation in procuring her signature to the same."

*In re Flannery's Estate,* 315 Pa. 576, 173 A. 303, 305, the Court said:

"In Clark's Estate, 303 Pa. 538, 154 A. 919, we reiterated what had been said in earlier cases that, if the provision made by a man for his intended wife, in an antenuptial agreement, is unreasonably disproportionate to his means, it raises a presumption of designed concealment, and throws the burden upon those who claim that the agreement was fair and conscionable. Unless this burden is carried equity will treat the transaction as one of constructive fraud and set it aside."

It was further held in that case that antenuptial contracts depend for their validity upon the reasonable provision for the wife, or full and fair disclosure to the wife of the husband's worth, and it was incumbent upon the husband to disclose to the wife the value of his property before asking her to waive all right therein.

*In re Waller's Estate,* 116 Neb. 352, 217 N. W. 588, 590, it does not appear that the parties were engaged at the time of the execution of the antenuptial contract. The Court said:

"That good faith is the cardinal principle in an antenuptial contract is the apt observation of a writer on this subject. He goes on to say that, if the provision made in the contract for the prospective wife is unreasonably disproportionate to the husband's financial worth, the presumption of designed concealment is raised, and the burden of disproving the charge rests upon the husband. 21 Cyc. 1251; *Warner's Estate,* 207 Pa. 580, 57 A. 35, 99 Am. St. Rep. 804; *Russell v. Russell,* 60 N. J. Eq. 282, 47 A. 37."

In *Potter's Ex'r v. Potter,* 234 Ky. 769, 771, 29 S. W. 2d 15, 16, it does not appear from the opinion that the parties were engaged to be married before the contract was entered into. It is there said:

"With respect to the burden of proof, the rule puts it on the party relying on the contract to show that it was fairly entered into, and, where it is apparently inequitable and unjust, the party assailing it is not usually required to produce the volume or degree of proof demanded for the overthrow of the ordinary written instru-

ment. \* \* \* It is the rule also that in such instances the prospective wife must have been apprised of the nature and extent of her prospective husband's estate and the value of her marital rights therein that she was surrendering by the instrument."

*In re Warner's Estate,* 210 Pa. 431, 59 A. 1113, the contract was made in contemplation of marriage and it does not appear that the parties were engaged at the time. The Court said:

"The cases which have sprung out of antenuptial contracts may be appropriately divided into two classes: (1) Those in which, notwithstanding the prospective wife's ignorance of the extent and value of the husband's estate, the contract was sustained because the court found that, in the circumstances, her provision was reasonable; and (2) those in which the contract was set aside because the husband's representative failed to show that a disproportionate provision was made with the wife's knowledge of the extent and value of his estate." And after quoting several cases, continued: "The reason which underlies the second class, with which we are concerned here, is that the parties deal with each other, not like strangers, at arm's length, but with the openness and fairness which the confidential relation existing between them necessarily implies, and whose absence constitutes a fraud which vitiates the transaction."

In *Russell v. Russell,* 129 F. 434, 441, the antenuptial agreement was executed a few days before the marriage. It does not appear from the opinion that the parties were engaged at the time of the execution of the contract. The Court stated:

"The law which governs in such cases is universal and well defined." And quotes a number of cases, some of which have been referred to in this opinion. It continues: "The parties who enter into an antenuptial agreement stand in such a relation of confidence to each other as to call for the exercise of the highest fairness and good faith. It cannot be expected that either will pry into the money affairs of the other, except possibly

in the most general way; or conduct an independent investigation with regard to them. The amenities of the situation forbid it, if nothing else. It is too suggestive of a mercenary motive in the marriage, which should be prompted by mutual affection, to be sanctioned. Each must therefore, of necessity, derive knowledge from the other of his or her property, and both must be frank. No agreement on any other basis will stand, as all the cases attest. Where the bargain is manifestly unfair, as where the provisions made by it on either side are inadequate or grossly disproportioned to the rights surrendered, the presumption is that it was brought about by fraudulent concealment, and the burden is upon those who seek to profit by it to show otherwise, which is as it should be, for the additional reason that the mouth of the one party is usually closed by the death of the other."

In *Denison v. Dawes,* 121 Me. 402, 117 A. 314, it was said:

"Parties to an antenuptial agreement, especially if the agreement to marry has already been entered into, occupy a confidential relation to each other, and the woman has the right to repose the fullest confidence in her prospective husband without seeking outside advice."

It seems to be held, almost universally, if there is an engagement to marry, followed by an antenuptial agreement, that there is a confidential relationship existing at the time of the agreement. In cases where it is not established as a fact and where the engagement to marry cannot be inferred, some cases hold that there is no existing confidential relationship at the time of the execution of the contract and that the parties deal with each other as if they were strangers, at arm's length, and that the burden of proof to establish confidential relationship is on the one assailing the contract. Notwithstanding this, the weight of authority seems to be that where the allowance made for the future wife is disproportionate to the wealth of the future husband, and

is unfair to the future wife who executed it in reliance upon the confidence she had in the future husband, upon proof of such facts the burden of proof shifts to the husband or his representatives to show that the contract was fair and reasonable, giving consideration to the situation in life of the parties.

In the case of *Naill v. Maurer, supra,* it does not appear that the parties involved in that case were engaged to marry at the time the contract was entered into. It was enforced. This Court in that case said:

"We have considered, with much diligence and care, the circumstances under which this contract was executed, as well as the relations previously and then existing between the contracting parties; and we find, apart from those portions of the evidence covered by the exceptions taken in the Court below, enough to satisfy us that the contract was entered into in good faith, and with a full and clear understanding of the purpose contemplated by its terms. There is not the slightest evidence that its execution was induced by imposition or fraud, or that the appellee was, from any cause, incompetent to bind herself by its stipulation. The contract was made in contemplation of marriage, and, as clearly appears, was intended to bar or prevent the acquisiton thereby of any right by either in the property of the other, in order that the marriage proposed might take place."

We shall not attempt to reconcile the authorities. We think when an antenuptial contract is entered into in contemplation of marriage, whether the parties are engaged to marry at the time or not, it is required of each to make a frank, full, and truthful disclosure of their respective worth in real as well as personal property. And in such cases where the disclosure of worth is not full and frank, fair and truthful, and the allowance provided in the agreement is unfairly disproportionate to the worth at the time, the concealment gives rise to the implication of fraud, and the burden of proof is cast on those claiming under it when the instrument is attacked,

to show that it was entered into freely, voluntarily, and knowingly and that each was given the opportunity to obtain independent legal advice. It would seem to be anomalous to say that the instant before a woman signs an antenuptial agreement she deals with her prospective husband as a stranger, and he with her, but that in the twinkling of an eye, after they append their signatures to the instrument, a confidential relation exists between them. In most instances such a conclusion is not based on the realities of life, but is more the product of fantasy. We cannot subscribe to the doctrine that a man and a woman, under such circumstances, are to be treated like merchant princes dealing with each other, each implemented with the exacting and hard instruments of commercialism.

The appellee set up the defense of laches.

"To say that because a wife does not institute proceedings promptly against her husband, to enforce against him her equitable claim, she is to be considered as guilty of such gross laches in prosecuting her rights, or of such long and unreasonable acquiescence in the assertion of adverse rights, that equity will refuse to interfere in her behalf, is to establish a principle but little calculated to preserve the peace and harmony which should exist between husband and wife." *Bowie v. Stonestreet,* 6 Md. 418, 61 Am. Dec. 318.

"Owing to the social importance of maintaining the family relation, in suits between wives and their husbands for the protection of the former's property, statutes of limitation, as also presumptions or estoppels by lapse of time, ordinarily, do not affect the rights of the wife, since she cannot be expected to treat her husband as a stranger. As certain courts have well said any other policy would be apt to beget disagreements and contentions in the family fatal to domestic peace." *In re Flannery's Estate, supra.*

"This court has definitely held that the statute of limitations does not run against the wife's right of dower until the death of the husband. * * * If the ante-

nuptial contract was procured or induced by means which rendered it invalid at the time of its execution, as between the parties it never had legal existence, and the law nor equity would not require that, to protect her ultimate rights, the marriage relations should be disturbed by an adversary action between them." *Rankin v. Schiereck et al.,* 166 Iowa 10, 147 N. W. 180, 181.

The law frowns upon the defense of laches in cases like the one under consideration, and such a defense is untenable.

Turning to the facts: Levy was a widower, fifty years of age, and was living with his six children, all of whom were of age, excepting two, who were twelve and fifteen years old respectively. He could not read or write English but could sign his name in Yiddish. Throughout his life he was engaged only in small business affairs. He and his first wife conducted a small grocery store. She seems to have worked as hard as he did. Levy also engaged in a modest way, in the business of buying poultry and produce on the curb and re-selling the same. Over the years he acquired certain leasehold properties. A few years before his first wife's death, the store business was sold and the proceeds therefrom helped to finance the purchase of the Towanda Avenue property to which they moved and thereafter resided. Levy promised his first wife, upon her deathbed, that he would do nothing to deprive their children of their inheritance in these leasehold properties. After the store business was sold and the family moved to the Towanda Avenue address, he engaged solely in the chicken business.

The appellant was a divorcee, twenty-seven years old, when she married Levy. At that time she owned no property at all. She could read English, but she says that where she came from in Europe she received a very limited education. After her marriage to Levy her mother gave her a piece of property, which she sold. The proceeds from the sale were invested in other properties, which she mortgaged. Appellant conducted these transactions. Following her marriage with Levy, she went to

live with him and his family at the Towanda Avenue address and lived with him thereafter until his death, a period of eighteen years.

As the children grew up they married, but they seem to have been always free to visit the home. Levy was a man who continually complained about his health, but he worked in the chicken business until six months before his death. During all these years the appellant looked after the home and the family. At one time Levy needed some money and his wife induced her mother to lend him the money, for which Levy gave his wife a note. Appellant wanted her husband to put the Towanda Avenue property in their joint names. This seems to have been prompted because of the loan which was made to her husband. The evidence shows there was discord in the home between Levy and his wife over property matters, and that Levy refused the appellant's request in regard to the change she desired in his property holdings. There was also some contention over the bringing of the appellant's mother to the home, which Levy would not permit. She left him for three or four months and there is some evidence that the separation was occasioned because of Levy's refusal to comply with the wife's demands concerning property holdings. She testified that she left because her mother was old and blind and it was necessary for her to look after her mother. However all this may be, she returned to Levy. There is evidence in the record that the appellant habitually nagged her husband to put the titles to his properties in their names, but that she refused to put her properties in their joint names. Whatever may be said about the nagging of the appellant, it is not denied that she looked after this home for eighteen years and certainly at times she must have been kind to her step-children. The oldest son needed money at one time to go into business. He thought he had borrowed two hundred dollars from the appellant's mother, but the fact is, he borrowed nineteen hundred dollars from the appellant's mother, and the evidence falls far short of showing that he ever paid it

back. Certainly the step-mother induced her mother to lend her step-son this money.

After the marriage, the eldest son testified, he met his father and his step-mother and he was requested to see the children, and to talk with them, so that the entry of the step-mother in the home would be pleasant. He says his father told him at that time, in the presence of the appellant, that he had "made a contract in which he had given this lady a thousand dollars * * * which would come to her at the time of his death," and that this was repeated by the father later to him, in the presence of the appellant.

In 1939 the appellant went to the office of Mr. Morton H. Rosen, an attorney at law, for the purpose of conveying some message to him from Levy. Rosen testified that appellant told him at that time that "she was having some discussions with him about him transferring his property in their joint names, and I asked her why hadn't that been done, and she said because he insisted that she had a lot of property, that she ought to transfer her property in their joint names. And I said, 'Isn't that fair?' And she said, well, something would have to be done about it because he has an agreement with her whereby upon his death she is to get a thousand dollars." It cannot be said that these statements the appellant made concerning an agreement she had with her husband under which she would receive one thousand dollars at his death if she survived, constitute proof of the fact that there was a full and fair disclosure made by Levy to the appellant of his property holdings at the time the antenuptial agreement was signed. At the time Levy's equity in his leasehold properties was worth $7,312.32 and he had cash on deposit in banks of approximately between fifteen hundred and two thousand dollars, and his net worth at the date of the execution of the antenuptial agreement approximated $10,000. The wife was without any property. The leasehold property that he owned at the time of his death was sold, through pro-

ceedings in the Orphans' Court by his administrators, for $14,500. The provision in the agreement limited her to one-tenth of her husband's property if she survived him. Regarding the fact that these parties were, as referred to in the argument, little people, it cannot be said that the substitution for the wife of a one-tenth share instead of a one-third share in her husband's property, upon her surviving him, was fair and reasonable. The disproportion of the allowance provided for her in the instrument, as compared to what she would otherwise receive as widow, is sufficient under the circumstances of this case, to cast the burden of proof upon the appellee to show that the antenuptial agreement was fair and equitable.

Without giving consideration to any of the evidence of the appellant concerning transactions she had with Levy regarding this agreement, the testimony offered in the case by appellees did not meet the burden of proof which the law casts upon them. To support the recitals of the antenuptial agreement, there was no evidence at all adduced by appellees to show that appellant actually knew, understood and agreed to the terms of the antenuptial agreement at the time it was entered into. There is nothing to show that a full disclosure of Levy's worth was made to appellant at the time, nor that she was advised of the rights she would acquire in Levy's properties upon marriage, and there is a total want of evidence to show that she had the benefit of independent legal advice. The decree in this case must be reversed.

One of the prayers in the bill of complaint is that the Court assume jurisdiction of the estate of Joseph Levy, deceased.

"It is no part of the ordinary jurisdiction of a court of equity to revise and correct the probate of wills. * * * Nor will they ordinarily intervene in the administration of estates by Orphans' Courts in the absence of special circumstances requiring the intervention of a court of chancery to do complete justice or give adequate relief." *Gaver v. Gaver*, 176 Md. 171, 4 A. 2d 132, 140.

There was some evidence that the administrators failed to return a small amount of money that the deceased had on deposit at the time of his death. The Orphans' Court possesses full power to deal with that matter, and as the result of this decision will be to restore the appellant to her distributive share as widow, there would seem to be no "special circumstances requiring intervention of a court of chancery to do complete justice or give adequate relief." This prayer should be denied and the administration of the estate continued by the Orphans' Court.

> *Decree reversed, case remanded for a decree to be entered in accordance with this opinion; costs to be paid out of the estate of Joseph Levy, deceased.*