## GURLEY *v.* GURLEY AND GURLEY

[No. 11, September Term, 1966.]

*Decided February 10, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER, McWILLIAMS and FINAN, JJ.

*James E. Hogan,* with whom were *Arthur J. Hilland* and *Ferdinand J. Mack* on the brief, for appellant.

*J. Hodge Smith* for appellees.

FINAN, J., delivered the opinion of the Court.

Appellant, Cynthia N. Gurley, hereinafter referred to as the wife, and appellee, Clyde C. Gurley, hereinafter referred to as the husband, were married in 1938; three daughters were born

of this union. Prior to this marriage the husband and his sister, appellee Mary Willard Gurley, hereinafter referred to as the sister, were each left an undivided one-half interest in several properties in and around Cumberland, Allegany County, Maryland, as tenants in common by the terms of their mother's will. The sister is a spinster and it is uncontroverted that her brother has always managed her business affairs, including those concerning the Cumberland properties.

The wife owned a house in Bethesda, Maryland, title to which was acquired on the death of her first husband; title later being transferred to both the husband's and wife's names as tenants by the entireties. In 1956 the husband and wife separated. The husband moved into an apartment; the wife remained in the family home with their three daughters. According to the husband, this separation was the result of his wife's instituting an action for separate maintenance and support while they were living together as man and wife. In the fall of 1958, the husband testified that he intensified his efforts toward a reconciliation, as he was finding it impossible to maintain two homes and send two daughters through college. At this time the husband was exploring various methods of putting his financial affairs in order. One of the elements of his plan for refinancing was to gain complete control over the Cumberland properties and in February of 1959, he consulted George Hughes, Esq., his attorney in Cumberland. As a result of his inquiries, a deed conveying his one-half interest in the Cumberland properties to the sister and releasing the wife's inchoate right of dower was prepared. The husband discussed the signing of this deed with his wife and it is admitted that prior to its execution he told her in effect, "this deed would never make any difference as long as she behaved herself and if she did not get us into any difficulty because of her dishonesty or her lying." He also told his wife that the purpose of this deed was to give him the freedom to provide a secure home and provide for the education and welfare of his children, free from her capricious and embarrassing conduct regarding monetary matters.

The deed, showing only nominal consideration, was executed on March 18, 1959, in the presence of a notary public, and the husband retained possession of the executed instrument in keep-

ing with his practice of handling all of his sister's business affairs. It is uncontradicted that the sister never saw the executed deed although she knew of its existence.

On the 28th of April, 1959, the husband moved back into the family home where they lived together as husband and wife until July 22, 1960, when they separated again and have remained separate and apart since that time.

The husband retained possession of the deed until February 1960, when he mailed it to Hughes, the husband's and sister's attorney in Cumberland. According to the husband this was done for "safekeeping" and he at this time "hoped never to record it." On March 31, 1960, the deed was recorded by Hughes and immediately thereafter a deed from the sister, conveying one of the Cumberland properties to Juliano, et ux., was placed on record. Two additional parcels of the Cumberland property were conveyed by the sister subsequent to the Juliano sale. Several other properties described in the deed remained unsold.

On June 6, 1963, the wife filed a bill of complaint in the Circuit Court for Allegany County against the husband and sister, praying that the deed of March 18, 1959, be canceled and annulled. After trial upon the merits, the bill of complaint was dismissed by order of court, dated December 10, 1965. This appeal followed.

The wife rests her case on the following contentions: (1) that the challenged instrument, although in the form of a deed of conveyance, is in substance a postnuptial blanket release of the wife's inchoate dower interest; (2) that the instrument viewed as a postnuptial release of dower is voidable because it is without consideration and unfair; (3) that the instrument is inoperative because of nondelivery to the grantee; and (4) the use to which the husband put the instrument constitutes a breach of the alleged agreement he made with the wife at the time he procured her execution of it.

## I and II

There is no legitimate construction that could be given the challenged instrument whereby it would be interpreted as a blanket release of the wife's inchoate dower interest. The legal effect of the instrument was to release, or to use a more pre-

cise word, to relinquish the wife's inchoate dower interest in the specific parcels of real estate described in the deed and it does nothing more. (Art. 45, § 12 Code (1957)). The wife's inchoate dower interest would still attach to any property of which the husband became seised in the future in his own name, or as a tenant in common, nor was dower relinquished as to any other real estate which he may have owned at the time of the execution of the deed, and title to which was vested in him individually in fee or as a tenant in common.

The testimony indicates that there was no additional property of which the husband was seised, other than that described in the deed to his sister; however, in the event that there was, the wife's inchoate dower would attach.

Furthermore, there was no relinquishment of the wife's dower interest in the husband's estate (Art. 46, § 4 and Art. 93, § 329 Code (1957)), in the event he should predecease the wife. Accordingly, the protestation in the appellant's brief that the challenged instrument constitutes a postnuptial release of dower is clearly fallacious.

Bringing the instrument into proper focus as a deed wherein the wife relinquished her inchoate dower interest in real property specifically described therein, was it without consideration and unfair?

The execution of the deed by the wife was a voluntary act. The Chancellor, who heard the testimony, stated in his written opinion: "The evidence indicated that the Complainant understood the significance of the deed and she voluntarily executed it."

Counsel for the wife stresses the need for adequate consideration in this transaction and emphasized the alleged lack of it, relying heavily on *Levy v. Sherman*, 185 Md. 63, 43 A. 2d 25 (1945) ; *Ortel v. Gettig*, 207 Md. 594, 116 A. 2d 145 (1955) ; *Livingston v. Hall*, 73 Md. 386, 21 A. 49 (1891) ; and *Reed v. Reed*, 109 Md. 690, 72 A. 414 (1909). A study of these cases reveals that none of them have any controlling effect on the case at bar. In both *Levy*, and *Ortel*, the Court was confronted with antenuptial agreements wherein the wife had relinquished all inchoate right of dower, not only in property presently vested in her husband, but in all property of which

in the future he might become seised, as well as all dower interest in his estate should the wife survive him. A comparison between such cases and the one at bar cannot be fairly drawn.

In *Livingston,* a bill *quia timet,* wherein the wife conveyed to the husband for "natural love and consideration, and one dollar," property which she had purchased "out of her own separate money and estate," for "her sole and separate use," falls far short of resembling a case where the wife relinquishes her inchoate dower interest in specific property of the husband acquired by him through inheritance.

In *Reed,* we find, if anything, a case helpful to the appellee. There the wife purchased property in 1896 for $14,500—a respectable sum in those days; and directed that title be vested in herself and her husband as tenants by the entireties. Later they were divorced in England and subsequently she endeavored to have the Maryland Courts restore complete fee simple title to her. This Court held that as a result of the divorce the parties held the property as tenants in common, but it did remand the case to the lower court for further proceedings as to the existence of any evidence of undue influence and coercion. Again, we are referred to a case, in which a basic distinction can be made between it and the case at bar, wherein we are concerned with a wife relinquishing her inchoate dower interest in specific property owned by the husband.

The most that any of these cases offer, insofar as assisting in the denouement of the issues before us, is that they buttress the well known and oft repeated principle of law that the Court recognizes the existence of a confidential relationship where transactions between husband and wife are concerned. In *Manos v. Papachrist,* 199 Md. 257, 262, 86 A. 2d 474, 476 (1952), Judge Delaplaine speaking for the Court aptly expressed it:

> "Ordinarily the relationship of husband and wife is a confidential one. Of course, in any given case it is a question of fact whether the marital relationship is such as to give the husband dominance over his wife or to put him in a position where words or persuasion have undue weight."

In summation, the law and factual situations, as found in the

authorities offered by the appellant, do not reach this case as to either the law or the facts.

This Court does feel that *Mueller v. Fid.-Balto. Bank,* 226 Md. 629, 174 A. 2d 789 (1961) is most apposite to the case at bar. Although this case involved real estate situated in New Jersey, it was noted by the Court at p. 634, 174 A. 2d 792, that: "The statutes of that State [New Jersey] as to how a wife can release dower, N.J.S.A. (1954 Supp.), Secs. 37:2-18 and 18.1, have essentially the same effect as those of Maryland, Code (1957), Art. 45, Sec. 12 and Sec. 20." In this case the wife executed a deed together with her husband and others whereby certain lands in the estate of her father-in-law were to be sold and her husband was to receive one-third of the proceeds. The husband received the checks representing his share of the proceeds, forged his wife's signature and cashed them; the husband died soon thereafter. The wife sued to recover the proceeds from the checks. The Chancellor ruled that the wife had shown no right to any of the proceeds from the sale and exonerated the bank by a summary judgment since the person entitled to the proceeds of the checks, the husband, had in fact received them. Judge Hammond (present Chief Judge) speaking for the Court said:

> "The case, as we see it, turns on whether it has been shown that the wife released her dower for the consideration to be paid to her husband alone and therefore should herself never have been made a payee on the checks. It is generally held that even if she herself receives no consideration, a wife's release of dower is valid and effectual if supported by consideration to her husband, although she may exact a consideration inuring to herself as a condition of releasing her dower. *Jarboe v. Severin,* 85 Ind. 496; *Moore v. Hudson,* 240 S. W. 383 (Ky.); *Watkins v. Minor,* 183 N. W. 186 (Mich.); 28 C.J.S. 'Dower' Sec. 65, pp. 138-9. An agreement that a wife is herself to be compensated is not usually implied, and it has been held that the presumption is that the inducement for her release is the consideration paid her husband, at least in the absence of a special explicit agreement to the contrary.

*Murray v. Cazier,* 53 N. E. 476 (Ind.) (rehearing den. 55 N. E. 880) ; *Jarboe v. Severin, supra.* It is clear that in New Jersey inchoate dower is a 'present fixed and vested valuable interest' in property within the protective jurisdiction of equity, *Hampton v. Hampton Holding Co.,* 111 A. 2d 761, 764 (N. J.), and undoubtedly Mrs. Mueller could have exacted a set price for releasing her dower. The question is, did she? We think not.

\* \* \*

"A wife who voluntarily releases her dower is not entitled to any part of the proceeds of sale of the real property involved. *Watkins v. Minor, supra; In re Madsen's Estate,* 259 P. 2d 595 (Utah)." (p. 633, 634, 174 A. 2d 791, 792.)

In the case at bar the husband and wife had a number of discussions as to the purpose and reasons for the execution of the deed to the husband's sister and, as may be expected, their versions differ. The husband maintains that he wanted to see the deed executed because it was necessary to keep him financially liquid. He testified that they were in danger of losing the home which the wife and children occupied in Bethesda and concerning which the mortgage was in default. He further stated: "I could no longer keep two children in college, support her, pay for her irresponsible conduct, and meet my obligations, without a freedom to have backing for my responsibilities, \* \* \*." The husband also testified as to his wife's misuse of money he had entrusted to her for mortgage payments which he claimed she used for other purposes in a capricious manner. He complained in general about her ineptness with household finances and her extravagant tastes. It had become necessary for the husband and wife to sign notes jointly in order to obtain funds for the daughters' schooling and for family needs. The husband claims that he was adamant as to the desirability of his daughters obtaining a college education; on the other hand he states the wife was not so inclined. He described his motivation in obtaining his wife's signature on the deed thusly, "this whole thing was a move again to give me the freedom to provide for the security of my home and welfare and education of my chil-

dren. This was important to me." He further testified that with her signing the deed he intended to effect a reconciliation, move back to the Bethesda home, and again take up the direction of family affairs.

The wife on the other hand testified that the matter of her signing the deed was represented to her as being necessary so that her husband and his sister could establish a trust fund for the children. The husband admitted that he had discussed this and explored the possibility of it, but found that it was not feasible and discarded the proposition. The wife also testified that on previous occasions the husband had violently beaten her and that at the time she executed the deed he threatened to kill her unless she complied; all of which was denied by the husband. In her bill and in her testimony the wife stated that the importunings of the husband to force her to sign the deed occurred "just after the plaintiff [wife] had returned from a period of hospitalization as a result of a nervous collapse, and while she was still under the influence of tranquilizing medicines." The testimony and the record however, conclusively refute this and show that the wife had been working steadily in a drapery shop prior to the execution of the deed and that it was not until two days after the execution of the deed that she was admitted to a hospital for cystitis.

The wife complained that she did not have independent legal counsel to advise her, nor the opportunity to obtain an attorney. Yet, she was not a stranger as to how to obtain legal advice, as she had consulted with approximately six lawyers concerning domestic matters within recent years.

On the day of the execution of the deed, March 18, 1959, by pre-arrangement, the husband called at the Bethesda home for the wife shortly after 9 a.m., drove her to the office of a law firm where the deed was executed and drove her back home, so she would not be late reporting for work at 9:30 a.m. The husband had dinner with the wife at the family home that night.

Leaving for the moment the allegations and recriminations of the parties, let us look at the record and see what happened after the execution of the deed. The husband retained custody of it until February 1960, when he sent it to George Hughes, Esq. The deed was recorded March 31, 1960, shortly prior to

the sale of one of the properties described in the deed to Juliano for the purchase price of $10,000. The proceeds of this sale, after deducting expenses, were divided equally between the husband and sister, each receiving $3,500. The husband's half was deposited in a joint bank account of the husband and wife in a Bethesda bank. Out of the proceeds of sale, a note in the amount of $1,400 with the Fidelity Bank of Frostburg, on which both husband and wife were joint obligors, was paid. This indebtedness had been incurred in the process of making renovations to the kitchen in the Bethesda home occupied by the wife and daughters. Another bank loan was liquidated which had been incurred when funds were needed for the daughter's tuition, dental bills and other family needs.

Two other properties described in the deed have been sold, each for the price of $3,500. The proceeds from these sales were deposited in the joint account of the husband and his sister. Additional properties described in the deed have not as yet been sold.

There was also evidence that at one time the husband had contemplated a deed of conveyance by his sister back to him of an undivided half interest, which would remain unrecorded. If this was ever executed and delivered, it is not as yet apparent.

The husband did effect an apparently bona fide reconciliation with the wife after the execution of the deed, lasting from April 1959 to June 22, 1960. The husband also carried through his commitments to educate his two older daughters—one graduating from Cornell University and the other from Hood College.

Viewing all of these circumstances the Court does not feel that the Chancellor erred in holding that the execution of the deed by the wife was a voluntary act. Nor, do we, in light of the facts and the principle of law enunciated in *Mueller, supra,* feel that the Chancellor was clearly in error in finding that the transaction, whereby the wife relinquished her inchoate dower interest in the specific properties mentioned in the deed, was unfair or without consideration. Rule 886 a.

### III

The contention that the instrument was inoperative because of non-delivery to the grantee requires little attention. As we

have recited elsewhere in this opinion the deed was executed March 18, 1959, and on the same day the wife (grantor) relinquished any control or custody she may have had of the instrument. It ultimately came into the custody of George Hughes, Esq., who was unquestionably attorney for the sister as well as the husband. The deed was recorded by Hughes on March 31, 1960.

Whether the requirements of a valid delivery have been met "depends largely on the facts of each case." *Gianakos, Executor v. Magiros,* 234 Md. 14, 26, 197 A. 2d 897, 903 (1964). A "manual delivery to the grantee is not necessary" and the clearly recognized rule is that "there has been a consummated delivery when the instrument has passed from the grantor, without right of recall, to the grantee or some person for his use." *Gianakos, Executor v. Magiros, supra,* p. 27, 197 A. 2d 903-04. Maryland also recognizes a presumption in favor of delivery when the deed in question has been properly acknowledged and recorded. These foregoing rules are thoroughly discussed in *Gianakos, Executor v. Magiros, supra,* and any further amplification of them here would needlessly prolong this opinion. Accordingly, applying the aforementioned principle of law to the facts in the instant case, we do not feel that the Chancellor erred in his finding that a valid delivery of the deed had been made by the grantors to the grantee.

## IV

We have heretofore in this opinion discussed the testimony of both the husband and wife concerning the circumstances surrounding the execution of the challenged instrument. We found the act of the wife in executing the deed to have been voluntary. Nor do we feel that the record reveals that it was attendant with fraud or duress on the part of the husband.

The Chancellor had the opportunity to hear the testimony of the husband, wife, and spinster sister and to observe their demeanor as witnesses. He failed to find the existence of fraud or such coercion or undue influence as would vitiate the transaction. We do not feel that he was in error. Rule 886 a.

Accordingly, the order of the Chancellor dismissing the bill of complaint will be affirmed.

*Order affirmed, with costs.*