HARTZ *v.* HARTZ

HARTZ *v.* HARTZ, ET AL.

[No. 595, September Term, 1966.]

48

*Decided November 9, 1967.*

*Motion for rehearing filed on December 6, 1967; denied on December 7, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-NEY, MARBURY, BARNES and FINAN, JJ.

*Ross O'Donoghue,* with whom was *Barnard T. Welsh* on the brief, for John D. Hartz, et al.

*Arthur J. Hilland,* with whom were *Ferdinand J. Mack* and *James E. Hogan* on the brief, for Anne Ridgely Hartz.

HAMMOND, C. J., delivered the opinion of the Court.

Anne Ridgely Hartz went into the equity court in Montgomery County to have set aside (a) an antenuptial agreement with her late husband, Barge L. Hartz, by which each relinquished all rights in the property and estate of the other; (b) certain gifts of stock, some outright, some in trust, which Barge Hartz had made several years before his death; and (c) to procure

discovery, accounting and recovery of assets she claimed belonged to the Barge Hartz estate. The parties stipulated that the case be tried in three parts, each claim of Mrs. Hartz to be considered and decided separately.

Judge Shook held that the antenuptial agreement was invalid because there had been no full disclosure of assets by either party to the other, but although Mrs. Hartz won the first battle she in effect lost the war when the chancellor ruled that the inter vivos transfers of stock were valid and effective. The losing parties appealed (in separate appeals which were argued together) the holdings against them.[1] We have concluded that the antenuptial agreement was valid and effective according to its terms and therefore do not reach the other questions in the appeals.

On the evening of January 23, 1954, Anne Ridgely Offutt, fifty-six years old, whose husband had died in 1951, met Barge Hartz, sixty-one years old, whose wife had divorced him in 1951, at a dinner at a country club in Chevy Chase. A whirlwind courtship of twenty-eight days followed. Hartz was the owner of almost all of the stock of the Colonial Ice Cream Company, which had a plant not far from the Capitol in Washington, and was its president and operating head. Among the assets of the company was a farm of just over a thousand acres in Virginia, partly in Fauquier County and partly in Rappahannock County. It was Hartz's custom to stay from Friday to Wednesday at the farm, on which was a substantial residence, and then return to Washington to direct his company from Wednesday to Friday. From January 23 to February 20, 1954, when they were married, Mr. Hartz took Mrs. Offutt to lunch

---

1. Mrs. Hartz moved to dismiss the appeal from the finding that the antenuptial agreement was invalid on the ground that the order of appeal was in the name of John D. Hartz (the son of Barge Hartz by a prior marriage) without the designation of "Executor of Barge Hartz." We think that if, as here, the record as a whole makes plain the representative capacity of the party appealing even though he does so without designation, C. J. S. *Appeal and Error* § 416; Niosi v. Aiello (D. C. Mun. Ct. App. 1949), 69 A. 2d 57; and the lower court and the other side of the case are adequately advised that a timely appeal is taken, the notice of appeal is effective.

or dinner or lunch and dinner at a club or expensive hotel every day they both were in town. When he was at the farm he would call her every morning at ten o'clock. Mrs. Offutt went with him to the farm on two occasions. They spent two or three days together, beginning on February 11, at the home of Mrs. Offutt's brother near Annapolis. Seemingly he had proposed to her before this. Mrs. Ridgely, a sister-in-law who testified for Mrs. Offutt, said that Hartz was an extremely well dressed, distinguished looking man of affairs and that during his stay with the Ridgelys he told them what she gathered he had already told Mrs. Offutt "more or less what his business was, his general holdings, * * * just that he had this farm and that he had the Colonial business, ice cream business." He intended to give the impression that he was a very well-to-do man. When asked whether Mrs. Offutt received that impression at that time, she answered: "I think we all did, more or less. I cannot answer for her impression but I know it was mine. It was my husband's." Mrs. Ridgely testified further that Hartz said he was very much in love with Mrs. Offutt and wanted to marry her and take care of her, and that "he wanted her to have everything in the world he could give her and do for her—that he wanted her to be the most beautifully dressed person * * * and that he was prepared to take care of * * * his farm and also the expenses of her apartment in Washington; and that he wanted her to have a sum of five hundred dollars as an allowance every month for her own personal use."

Mrs. Offutt did not then have "everything in the world" but she did have a substantial estate she had inherited from her husband. She owned a store property in Bethesda worth in 1954 some $160,000 which produced for her a net income of $9,600 a year and a two-thirds interest in the Bradley Terrace Apartments in Chevy Chase, her interest being worth some $140,000, and producing from $4,800 to $5,300 a year. Her total income was from $14,400 to $14,900 a year.

Mrs. Offutt supervised both of these income-producing properties, the store with the help of her thirty-year-old son, and the apartments—there were over twenty—with the help of a janitor and an accountant. Mrs. Offutt collected the rents, kept the accounts, summoned the painter, the plumber and other nec-

essary artisans. In connection with the settlement of her husband's estate, she had consulted her husband's lawyer over a period of time. Later she consulted her own lawyer, described by the chancellor as one "who has a fine reputation in Montgomery County," in connection with her real properties.

The financial picture of Mr. Hartz in early 1954 showed that he was worth approximately as much as Mrs. Offutt. He owned outright 1,510 share of the common stock of Colonial Ice Cream Company and held 700 shares as trustee under an agreement with his divorced wife, made in 1951, by which she would get the 700 shares or $25,000 in cash within sixty days of his death. There were 2,345 shares outstanding. The company had paid no dividend for many years. After paying Hartz a salary of $27,500 it had a net profit of $26,171.29 for 1952 and $1,527.30 for 1953. Out of his salary Hartz had to pay his divorced wife $9,600 a year. The ice cream plant was appraised by a qualified witness at $271,500 as of February 1954, which meant a net of $161,500 after deducting a mortgage of $110,000. The only other real asset of any value of the company was the farm which had been appraised in 1956 by three well qualified local appraisers at $150,000. On the testimony of one of these it could be properly found that the farm would have been worth ten per cent less in 1954, or $135,000. The net aggregate value of the real estate was some $296,000.

The book net worth of the holdings of Mr. Hartz and Mrs. Offutt was quite nearly equal in 1954, and their respective net incomes were not far apart. The valuation which Hartz and his first wife put on the stock of Colonial in 1951, when they dealt at arms' length, was $25,000 for 700 shares, or less than $36.00 a share. On that basis the 1,510 shares Hartz held outright would have been worth $54,300. The book value of Colonial common stock per share as of December 31, 1953, was $229,-680.84, or about $98.00 a share, and this included the farm at a valuation of $136,335.55 as well as the personal property on the farm and in the plant. At $98.00 a share the total worth of 2,210 shares was $216,580 (less $25,000 if the first Mrs. Hartz took cash) or $147,980 if she took the 700 shares.[2]

2. Several years after the marriage, Colonial sold its ice cream business at a good profit over book value and leased its plant for

As Mrs. Offutt contemplated marriage to Hartz she became concerned with the possible future financial effect on her son. At her brother's suggestion, she went to see the lawyer who had represented her in connection with her income properties for "the specific purpose of protecting the estate that she received as a result of Mr. Offutt's death, and her son's inheritance." She had a conference of at least half an hour with the lawyer, who knew of her holdings, and, among other things, must have told him of the holdings of Mr. Hartz because the lawyer testified that she came to his office and

> "made a statement of fact to me and asked me certain questions, as a result of which the agreement was prepared. * * * She informed me she was contemplating a marriage with Mr. Hartz; that they both had at least one child and that they both wished to protect the interests of their respective children; that Mrs. Hartz told me that she would not marry Mr. Hartz if it would in any way jeopardize her estate going to her son. * * * She told me she had discussed this matter with Mr. Hartz and that Mr. Hartz had indicated that it was acceptable to him to have her estate protected so that he would not have any claim in it."

The lawyer was then asked: "* * * do you mean to infer that the initiative of this agreement was with Mrs. Hartz?" He answered: "That was my understanding * * *. Mrs. Hartz told me they both had an estate * * * that they wished to protect for their respective children, and that she would not marry him unless it could be done * * *. It was that simple." The lawyer knew nothing of the estate of Mr. Hartz except what Mrs. Offutt told him. She told him Mr. Hartz was the "owner or part owner or operating head" of the Colonial Ice Cream Company and had a farm near Culpeper where she expected to go to live. The agreement contained the clause:

---

ten years at $35,000 a year. Increases in value of the Colonial real estate in Washington and the farm in Virginia made Mr. Hartz's worth at the time of his death (if the gifts shortly before are included) perhaps a million dollars. However, the decisive point in determining net worth is the time of the agreement.

"It is further agreed that this agreement is entered into by each party with a full knowledge on the part of each as to the extent and probable value of the estate of the other and of all the rights conferred by law upon each in the estate of the other by virtue of said proposed marriage, but it is their desire that their respective rights in each other's estate shall be determined and fixed by this agreement * * *."

The lawyer said that clause was put in the agreement because

"Mrs. Offutt told me they both had estates they wished to protect, and that the estates were such they would not contemplate the marriage without protecting the estate, particularly Mrs. Offutt would not * * *. I was led to believe that they both had estates that were substantial."

The lawyer first drafted an agreement to be executed by Mr. Hartz only. He then received a call from a lawyer who represented Mr. Hartz informing him that the agreement was to be executed by both. He then conferred with Mrs. Offutt by telephone and with her consent drafted the agreement that later was signed, and he mailed a copy to Mr. Hartz's lawyer. Thereafter, on February 17, 1954, three days before they were married, Mr. Hartz and Mrs. Offutt came to her lawyer's office and signed and swore to the agreement. The lawyer recorded it in the land records in August 1955.

The agreement recites that it is to bar the right of each in and to the property and estate of the other "in order that the proposed marriage may take place, with the respective children, heirs and devisees of the parties being protected from any possible claim of the surviving party * * *." Each agrees to make no claim given by law or statute on the estate of the survivor, and each agrees that he or she will join in any conveyance of the real or personal estate of the other necessary to make the conveyance effectual. Finally, as was said earlier, each agrees that he or she has "full knowledge" of the "extent and probable value of the estate of the other and of all rights conferred by law upon each in the estate of the other * * *."

The chancellor held that there had not been the full and frank disclosure of the nature and value of the husband's estate required by the law to validate a release of a prospective wife's claim to the estate of her husband to be and therefore the antenuptial instrument was invalid. To the argument that each must have known of the financial worth of the other, the chancellor's answer was that their knowledge was too indefinite. The finding of the lack of full disclosure or of actual knowledge of the wealth of the husband was held by the chancellor to be fully determinative of the issue. She gave no consideration to whether, in spite of the non-disclosure 'or lack of adequate knowledge, the agreement overall was fair and equitable in the result as well as in execution and was entered into voluntarily and knowingly on independent legal advice.

The law on the point in Maryland is clear and well established. The validity, propriety and, indeed, favor in the eyes of the law of antenuptial agreements settling or barring property rights of the parties is recognized. *Naill v. Maurer,* 25 Md. 532; *Schnepfe v. Schnepfe,* 124 Md. 330, 333-37; *Cohn v. Cohn,* 209 Md. 470, 475; *Levy v. Sherman,* 185 Md. 63, 66-67. In *Levy* the man was a widower fifty years old, with net assets of $10,000. The woman was twenty-seven, a divorcee with no property and a very limited education. They had a date to go to the movies but he took her to the office of a man (who professed to be but apparently was not a lawyer) whom she had never seen before and did not ever see again. The man immediately produced a paper and asked her to sign it. Levy told her it was a paper he had to have to carry on his business after they were married and, having faith in him, she signed it. By the terms of the paper she was to receive $1,000 and the household furniture at Levy's death.

The Court held there had been no disclosure of worth despite a recital in the agreement that the woman knew the value of the man's property and concluded that what the wife was to receive was greatly disproportionate to what she otherwise would have been entitled, and was not on its face fair and reasonable. It further concluded that the personal representative of the husband had not met the burden of proof cast upon the estate in such case to show that the woman actually knew, un-

derstood and agreed to the terms of the antenuptial agreement at the time it was entered into or that she was advised of her rights in Levy's property and estate or that she had the benefit of independent legal advice. Because of (a) non-disclosure and inadequate benefit and (b) lack of proof of knowing and voluntary execution, with full advice as to her rights and consequences by independent counsel, the agreement was nullified.

*Levy* was followed by *Ortel v. Gettig,* 207 Md. 594. In that case there was no disclosure of the net worth of the parties. The woman had no independent legal advice. The man was a sixty-two year old widower whose assets at the time of the execution of the agreement which was drawn by the husband's lawyer were $75,000, exclusive of his interest in an electrical business which the chancellor thought to be very valuable. The woman, forty-two years old, had $10,000. She was not advised as to the full legal effect of the agreement. She was inexperienced and said she did not know the effect of the agreement.

The Court said the real question on the merits was "whether the case is controlled by *Levy v. Sherman,* or falls outside of its operation because the marriage was one of convenience." The Court held that as in *Levy* a confidential relationship existed and that the facts were sufficiently analogous to those in *Levy* to require it to control. The Court noted that the wife acknowledged that she knew the husband had an electrical business and owned several shorefront houses in Baltimore County, but found she knew nothing of his intangible property or the value of the business or real estate, and held that "such indefinite knowledge or information falls far short of actual knowledge of his worth."

*Levy* and *Ortel* establish the law of Maryland to be that there is a confidential relationship between a man and a woman who are about to enter into an antenuptial agreement whether or not they are then engaged and whether or not the marriage is to be one of convenience; that this confidential relationship calls for frank, full and truthful disclosure of the worth of the property, real and personal, as to which there is a waiver of rights in whole or in part, so that he or she who waives can know

what it is he or she is waiving.[3] If there is adequate knowledge of what that frank, full and truthful disclosure would reveal, this may serve as a substitute though there has been no such disclosure. If there is neither proper disclosure nor actual knowledge and the allowance made to the one who waives is unfairly disproportionate to the worth of the property involved at the time the agreement is made, the burden is cast upon the one who relies on the agreement to prove that it was entered into voluntarily, freely and with full knowledge of its meaning and effect. The reviewing court is much more apt to find there was voluntary and understanding execution if the one who later asserts invalidity had independent legal advice as to the execution. Judge Oppenheimer, for the Court in *Day v. Day,* 237 Md. 229, 235, a case involving the validity of a "waiver and consent" signed by a wife not represented by counsel, whose husband used it to obtain a divorce from her in a "quick divorce" State, pointed out that: "The Court has recognized the importance of a wife being represented by independent counsel in considering the validity of an antenuptial agreement. *Levy v. Sherman,* 185 Md. 63 * * *."

The real test in a determination of the validity of an antenuptial agreement is whether there was overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement. Frank, full and truthful disclosure of what is being relinquished (or in lieu thereof actual knowledge otherwise available or obtained) is the key that turns the lock of the door leading to impregnable validity.[4]

---

3. The careful practitioner has often caused to be prepared an itemization of the property covered by the agreement with appraised values and caused it to be made a part of the agreement.

4. In spite of her testimony that she did not know, there is in the record much which could have led the chancellor to find that Mrs. Offutt knew or should have known that Mr. Hartz had property worth at least as much as, if not considerably more than, she had—that is, the testimony of her sister-in-law, Mrs. Ridgely, the testimony of her lawyer as to his knowledge of the assets of Mr. Hartz, his two-day work week, his desire to give his prospective wife $500 a month "pin money," and other indications.

These sources of information well may have led Mrs. Offutt to

If there is not adequate disclosure or knowledge (we will assume that the chancellor was not in error in deciding there was not), the validity of the agreement must be tested by other standards—that is, was the benefit to the wife commensurate with that which she relinquished so that the agreement was fair and equitable under the circumstances — and did the subsequent would-be repudiator of the contract enter into the agreement freely and understandingly. Lindey, *Separation Agreements and Ante-nuptial Contracts,* § 90-44, points out that failure to disclose or lack of precise knowledge will not necessarily be fatal to the validity of an antenuptial agreement, saying: "The test of the *adequacy* of the provision will still remain, and if it is met, the agreement may be enforced. For the basic issue is overreaching, not the absence of disclosure. If the intended wife is not prejudiced by the lack of information, she may not repudiate." See also *In re Cantrell's Estate* (Kan.), 119 P. 2d 483; *In Re McClellan's Estate* (Pa.), 75 A. 2d 595.

In determining whether or not the one who waives was prejudiced or unfairly or unreasonably treated, either in result or in being induced to enter into the contract to waive, the courts have weighed and assessed various pertinent and relevant factors, including the situation of the parties, their ages, their re-

---

believe that Mr. Hartz had far more money than his then actual holdings or $18,000 a year income, and show that she may well have had knowledge that amounted to significantly more than the "indefinite knowledge or information" referred to in Ortel v. Gettig, 207 Md. 594, 612. Lindey, Separation Agreements and Ante-nuptial Contracts, § 90-44 says: "While the disclosure should be full, fair and open, it has been said it need not be a drastically sweeping one, and the wife need not know the husband's *exact* means, so long as she has a general idea of his property and resources." See also Colbert v. Rings (Ill.), 83 N. E. 274; In re Holwig's Estate (Pa.), 33 A. 2d 915.

Mrs. Offutt, a literate and intelligent woman, signed and swore to the statement put in the agreement by her lawyer as a result of what she had told him about the extent, nature and general value of her intended husband's property and resources. It has been held that such a formal recital is prima facie evidence that the man has made full disclosure of his worth or that she otherwise had adequate knowledge and that the burden is then upon the wife to disprove this. In re Snyder's Estate (Pa.), 100 A. 2d 67.

spective holdings and income, their respective family obligations or ties, the circumstances leading to the execution of the agreement, the actions of husband and wife after the marriage as they tended to show whether the agreement was voluntarily and understandingly made, the needs of him or her who made relinquishment, including whether or not that one, after the death of the other, can live substantially as comfortably as before the marriage. Lindey, *op. cit.* § 90-37, and *In re Cantrell, supra; In re Kaufmann's Estate* (Pa.), 171 A. 2d 48; *In re Emery's Estate* (Pa.), 66 A. 2d 262; *In re Groff's Estate* (Pa.), 19 A. 2d 107; *In re McCready's Estate* (Pa.), 175 A. 554; *Appeal of Neely* (Pa.), 16 A. 883; *Wulf v. Wulf* (Neb.), 261 N. W. 159. Under any of these tests and under all of them considered cumulatively, the antenuptial agreement that Anne Ridgely Offutt and Barge Hartz entered into on February 17, 1954, was knowingly, understandly, freely and voluntarily entered into by both and was then fair and equitable to both and binding and effective on both.

Mrs. Offutt and Mr. Hartz were of mature and comparable age, each was in apparent good health, each moved in the same general social strata as the other, each had been previously married and had one adult son to whom presumably would pass at the death of his parent, by intestacy or by will, the property worth approximately $300,000 which each parent possessed (and which produced comparable incomes for each). Each released all claims during life and at death to the principal of the other. The rights released by each were the same and of an almost equal value. For example, under Code (1957), Art. 93, § 136, whichever spouse survived the other would have a right to claim the same proportionate share in the estate of the decedent. Each kept approximately the same amount, and the result was a mutual allowance or benefit to each. This apparently was recognized in *Ortel*, where the Court decided that the same rules were to be applied where the prospective wife got nothing under the agreement as where she was to receive a small allowance, and then emphasized "that there was a great disparity between the values of the estates of the prospective husband and wife." The opinion in *Levy* noted several times that the wife in that case had no property.

The record demonstrates that there was no fraud, actual or implied, no overreaching, no unfairness and no pressure leading to the execution of the agreement. When asked to characterize Mrs. Offutt's business ability, her lawyer said she "was an intelligent woman and able to handle her affairs * * * I thought she was completely competent." Again, he said in reference to her business experience: "She was well informed in reference to her affairs, in my judgment." The chancellor, justifiably in our view, found that she was "a woman of intelligence," that she was an "intelligent business [person]," and that she was and is "an astute, careful, intelligent woman * * *." This astute and careful lady was determined, even to the point of not marrying Mr. Hartz, to protect her son's absolute right to inherit her considerable estate which had come to her from his father. On her own initiative she went to her own reputable and competent lawyer for advice as to how to accomplish her objective. She told him the facts, including the facts that her intended husband had a farm in Virginia where she was going to live and headed the Colonial Ice Cream Company, and that these assets were of a substantial value (it seems probable that the impression of his wealth that Mr. Hartz sought to give and apparently gave and his courtship "puffing" as to the manner in which he wished to care for his wife after marriage may well have led Mrs. Offutt to believe his wealth was much more substantial than it actually was). She was advised that a written waiver by Mr. Hartz of all rights in her property would accomplish her purpose. Mr. Hartz agreed to execute such a waiver. The chancellor found that Mrs. Offutt had "independent means" which were "considerable" and that "the husband knew of these means prior to their marriage and was told by her that this was the reason she wanted the antenuptial agreement." However, when an unilateral release by Mr. Hartz was suggested or presented, he apparently recalled as sound the old adage that what is sauce for the goose is sauce for the gander, and asked his lawyer to tell Mrs. Offutt's lawyer that the release of claims should be mutual. Her lawyer relayed this message to Mrs. Offutt and she agreed. She now claims that she did so because Mr. Hartz had promised to pay her $500 a month pin money during their marriage and to provide for her in his will. Put-

ting aside that such promises to have been enforceable would have had to have been in writing under the fourth section of the Statute of Frauds, 29 Car. II, Cap. 3, § 4 (1677), since made in consideration of marriage, the record offers no support for the claim. Indeed, Mrs. Hartz does not say that Mr. Hartz ever offered the $500 a month and the testamentary care as consideration for or as an inducement to the execution of the agreement, or that they were even referred to in that connection —only that in her own mind they made it seem fair for her to release her claim to his estate. She did not speak of these so-called promises to her lawyer and there is no mention of them in the agreement as there almost certainly would have been if an astute, careful woman of affairs had considered them a consideration for its execution by her.

Mrs. Hartz conceded in her testimony that she signed the agreement voluntarily and intended to be bound thereby, and the chancellor so found, saying: "the contract was voluntarily entered into between the parties, each of whom had independent legal advice." There can be no doubt that Mrs. Offutt knew and understood that by virtue of the terms and provisions of the agreement Mr. Hartz had no legal right to any part of her property during her life or after her death and that she knew and understood that when she signed the agreement she was waiving, giving up and relinquishing exactly the same rights and claims as had he, with the result that she would have no legal right to any part of his principal during his life or at his death.

The chancellor found as a fact "that Mr. Hartz and Mrs. Hartz considered the agreement to be valid during the ten years of their married life." Mr. Hartz gave his wife $500 a month for about a year after their marriage but stopped doing so after their first joint income tax return was sent to him by his accountant (perhaps he felt that he was making an equivalent allowance by paying the tax attributable to her income). Mrs. Hartz said from the stand that she first became "dissatisfied" with the antenuptial agreement when the $500 a month payments stopped. The record is barren as to any demand therefor or assertion that the agreement was invalid for failure of consideration or otherwise during the remaining nine years of their

married life. *Cf. Faller v. Faller,* 247 Md. 631. On the contrary, Mr. Hartz continued to support her in the rather luxurious style to which she was accustomed and she testified that they enjoyed a very happy marriage until March 1964, some four months before his death.[5]

In 1959 Mrs. Hartz found and read a will in which Mr. Hartz recited that "My dear wife * * * and I entered into a prenuptial agreement under date of February 17, 1954," and provided that "Notwithstanding the provisions of said agreement, I give * * * to my wife * * * ($15,000) if she survives me." Mrs. Hartz did nothing to dispel her husband's belief in and reliance on the validity of the agreement or to show that she did not think it valid. In 1956 and again in 1959 Mrs. Hartz executed deeds of trust on her properties by her sole signature in reliance, the instruments recited, on the antenuptial agreement of February 17, 1954.[6]

Coming to the test listed last, it appears that the wife's ability to live as comfortably after the death of her husband as she did before the marriage and during the marriage was not prejudiced or substantially altered by the agreement. She retained as her own her income producing estate and may well have been able to save each year of her marriage a significant part of her annual income.

---

5. Mrs. Hartz says that in March 1964 Mr. Hartz, without cause or justification, suddenly said he wanted nothing more to do with her. Mr. Hartz had a prostate operation in 1959 and in 1964 was forced to undergo an orchidectomy. In his last months he suffered badly from enuresis and needed much physical care and attention. Mrs. Hartz left him with his consent to go on a visit to Boston. When she returned, she says he told her that he wanted nothing more to do with her and rejected her efforts to care for him and help him for three weeks. Then on her physician's advice she went to Florida. His lawyer testified that Mr. Hartz told him this made him "hurt and discouraged * * * his wife had abandoned him when he had become physically incapable and a burden upon her and he was quite resentful of that fact." This was the reason, according to the lawyer, that he made no provision for Mrs. Hartz in his last will executed on March 20, 1964.

6. The chancellor would not admit the proffered deeds of trust. Mrs. Hartz conceded they were made and contained the recital as to reliance on the agreement but denied their relevance and materiality. We think they should have been admitted.

In summary, we think that the record shows that the agreement was entered into freely and voluntarily, with full understanding of the rights being waived and with at least an approximately definite knowledge of the value of the property as to which of those rights were being released and that the results of the agreements were fair and equitable under the circumstances. Mrs. Hartz is bound by the agreement. Lindey, *op. cit.* § 90-36; *Del Vecchio v. Del Vecchio* (Fla.), 143 So. 2d 17.[7]

> *Order dismissing the amended and supplemental bill of complaint affirmed, costs to be paid by Anne Ridgely Hartz.*

---

7. Recent cases in which the situation of the parties was analogous to that in the case before and in which the Court sustained the antenuptial agreement include In re Stever's Estate (Colo.), 392 P. 2d 286; Cantor v. Palmer (Fla.), 166 So. 2d 466; In re West's Estate (Kan.), 402 P. 2d 117; Lightman v. Magid (Tenn.), 394 S. W. 2d 151; In re Beat's Estate (Wisc.), 130 N. W. 2d 739 (postnuptial agreement); In re Borton's Estate (Wyo.), 393 P. 2d 808.